**PICCADILLY SQUARE, a Joint Venture, Crowe–Proctor, Inc., Allen Kahlili and Harold Morris, Plaintiff–Appellee,**

**v.**

**INTERCONTINENTAL CONSTRUC-TION CO., INC., Ali Noureddini, and Akbar Arab, Defendants–Appellants.**

Court of Appeals of Tennessee, Middle Section, at Davidson Equity.

Sept. 8, 1989.

Application for Permission to Appeal Denied by Supreme Court Dec. 4, 1989.

Robert S. Patterson, Boult, Cummings, Conners & Berry, Nashville, for plaintiff-appellee.

Gail Pigg, Nashville, for defendants-appellants.

## OPINION

LEWIS, Judge.

Plaintiff, Piccadilly Square, a Joint Venture of Crowe–Proctor, Inc., Allen Khalili and Harold Morris, filed its complaint against defendants, Intercontinental Construction Co., Inc. (Intercontinental), Ali Noureddini and Akbar Arab,[1] for an alleged breach of contract and fraud. Following a bench trial the Chancellor entered a judgment against the defendants "in the amount of $112,000.00, plus interest at the rate of ten percent from November 29, 1984 to date of entry of the judgment."

Plaintiff's complaint sought to enforce a contract (hereafter Construction Agreement) entered into on 28 October, 1983, with Intercontinental. The Construction Agreement provided, *inter alia*, that Intercontinental would construct duplex townhouses in a development in Davidson County, Tennessee, known as Piccadilly Square. Intercontinental agreed to construct each unit for a turn-key price. The units would be pre-sold by plaintiff to purchasers for a higher price than the turn-key price. Plaintiff would be entitled to the difference between the turn-key price and the price for which plaintiff had pre-sold the unit. The Agreement further provided that Intercontinental would construct "a minimum of eleven (11) or a maximum of thirty-five (35) of these buildings," at plaintiff's option.

Differences arose between plaintiff and Intercontinental and, on 22 October 1984, a Compromise and Settlement Agreement was entered into which, among other things, modified the Construction Agreement by increasing the turn-key price Intercontinental would receive. Intercontinental had commenced the construction of ten units and the Compromise and Settlement Agreement relieved it from constructing the remaining twenty-five units.

1. Hereafter the defendants will be referred to collectively as defendants or individually by name.

Defendants Ali Noureddini and Akbar Arab, the principals of Intercontinental, were sued individually for fraud on the ground that they caused Intercontinental to fraudulently convey the units to themselves. Plaintiff alleged that they then sold the units and kept the proceeds in excess of the turn-key price even though under the Construction Agreement Intercontinental was to remit the difference between the turn-key price and the sales price to plaintiff.

The trial began on 29 September 1986. During cross-examination of plaintiff's first witness, defendants moved to amend their answer, asserting that they had just learned facts which would support a recision of the Compromise and Settlement Agreement. A continuance was granted and thereafter defendants filed an amended answer alleging that the Compromise and Settlement Agreement was void because it was fraudulently induced. Defendants asserted that a major consideration of Intercontinental in signing the Compromise and Settlement Agreement was to obtain relief from the provision of the Construction Agreement which required Intercontinental to continue to build units on the remaining lots at the plaintiff's option. Defendants insisted that the plaintiff fraudulently concealed the fact that it had transferred the remaining lots prior to the negotiation of the Compromise and Settlement Agreement and withheld this information in order to induce Intercontinental to enter into the Compromise and Settlement Agreement. Approximately thirteen months later, on 2 November 1987, the trial resumed. Evidence was completed on 3 November 1987 and the Chancellor took the matter under advisement, rendering a Memorandum Opinion on 16 August 1988. The Memorandum Opinion was amended on 19 September 1988.

## THE FACTS

Plaintiff was formed in the summer of 1983 as a joint venture between Crowe-Proctor, Inc., Allen Khalili and Harold Morris for the purpose of developing real property.

Following the formation of the joint venture, an evaluation of various properties was begun. On 27 September 1983, plaintiff entered into a real estate sales contract with Wellington Enterprises, Inc. for the purchase of twenty-two lots located on Antioch Pike in Davidson County, Tennessee (The Piccadilly Square Subdivision property). Plaintiff also had an option to purchase thirteen additional lots. Plaintiff, after having secured the property, performed market studies and financial projections. The evidence is that numerous hours were spent determining which type of buildings should go on the property, projecting rental income, and calculating potential return on the investment in the units and developing plans and specifications. After this was done, the next step was to find a contractor.

After talking with several contractors, plaintiff entered into the Construction Agreement with Intercontinental on 28 October 1983. Intercontinental is a company that has always represented itself to be an experienced construction company.

The Construction Agreement contains the following pertinent provisions: (1) Intercontinental would acquire eleven of the lots which plaintiff had contracted to buy from Wellington Enterprises, Inc. and build eleven duplex townhouses. It also provided for the construction of additional units at the option of plaintiff; (2) Intercontinental would construct the units for $67,490 per duplex building. This would include the cost of the lot, loan costs, interest and costs and fees incurred in selling the constructed duplex to purchasers; (3) Intercontinental would obtain construction loans in its own name; (4) Intercontinental would acquire the lots in its own name and pay the lot price from the construction loan; (5) plaintiff would pre-sell the units by getting purchasers to obtain commitments for permanent loans and "take-out" Intercontinental from the construction loan; (6) Intercontinental would pay all charges incurred as a result of delay in construction regardless of who caused the delay; (7) if Intercontinental failed to complete the units in "strict compliance" with the plans and specifica-

tions, neither the plaintiff nor the investor would have an obligation to close; (8) if Intercontinental could not complete any phase of the construction for any reason, regardless of fault, or if plaintiff decided the construction loan pay-off substantially exceeded the construction price, plaintiff had the "unequivocal right to terminate the contract and to be indemnified" by Intercontinental; (9) plaintiff would pre-sell the units to investors and Intercontinental was required to execute a contract with the investor; (10) Intercontinental could not modify or alter the terms of the designated contract, either unilaterally or with the approval of the other contracting party; (11) if Intercontinental breached the contract with the third-party purchaser, it constituted a breach of Intercontinental's obligation to plaintiff; and (12) the contract sales price for which the units could be sold to a third party was set by plaintiff, from which the sum $5,150 would be immediately paid to plaintiff to off-set "front-end" marketing and "negative cash flow expenses."

Through plaintiff's efforts, Dave Rowland agreed to purchase eleven units. Pursuant to the Construction Agreement, on 20 December 1983, Intercontinental entered into a "Contract For The Sale of Real Estate" with Dave Rowland. Mr. Rowland agreed to purchase eleven 2–story duplex townhouses and Intercontinental agreed to construct the eleven duplex townhouses in the Piccadilly Square Subdivision. Mr. Rowland obtained a commitment letter for permanent financing which plaintiff provided to Intercontinental for use in obtaining construction loans.

Intercontinental then purchased eleven of the lots which were under contract to plaintiff. The Construction Agreement required Intercontinental to complete construction within sixty days.

Construction was not completed in accordance with the time schedule set forth in the Construction Agreement. Intercontinental insisted at trial that the construction was delayed because there was no temporary electricity at the site, no water at the site, and the roadways were uncompacted and ungraveled. Intercontinental complained about the aspects of the development of the property by Wellington Enterprises, Inc. However, under the contract, plaintiff had no right to control Wellington Enterprises, Inc.

Differences arose between the parties and Intercontinental began to dispute the validity of the Construction Agreement. As a result of the dispute and Intercontinental's concern about the increased costs of the units, which allegedly resulted from construction delays, the Compromise and Settlement Agreement was entered into between plaintiff and Intercontinental on 22 October 1984.

The Compromise and Settlement Agreement provided, *inter alia*, that Intercontinental would complete construction of the ten units under construction, that Intercontinental would execute a warranty deed to the purchaser Dave Rowland upon receipt of the sales price, and that Intercontinental would deduct its turn-key price and pay over the remaining proceeds of the sale to plaintiff.

On 13 November 1984, Intercontinental and plaintiff received a letter from the attorney representing Mr. Rowland. The letter stated that Intercontinental was in breach of its contract with Dave Rowland because it had not provided the units within the time period set forth in the Construction Agreement.

Paragraph 3 of the Construction Agreement provides that Intercontinental's failure to complete construction of the units in a timely fashion "relieves the Joint Venturer [plaintiff] or any investor's obligation to close said permanent financing."

After Mr. Rowland declined to go forward following Intercontinental's alleged breach, plaintiff sought out other investors and provided substitute contracts to Intercontinental. However, Intercontinental refused to accept them. Plaintiff insisted that Intercontinental refused to accept the substitute contracts because the individual defendants Ali Noureddini and Akbar Arab had caused Intercontinental to convey the units to the individual defendants and that the individual defendants immediately encumbered the units with substantial mort-

gages. Intercontinental and the individual defendants admit the conveyances by Intercontinental to the individual defendants were made for no consideration. Subsequently, many of the units were conveyed by Mr. Noureddini and Mr. Arab to third parties for prices in excess of $85,000 each. None of the proceeds from these sales were paid to plaintiff.

The defendants insisted at trial that to have entered into the substitute contracts would have been illegal and fraudulent, both as to the mortgage company and the federal government. They insisted that the contracts called for a purchase price of $55,000 per unit with an addendum showing a "cash furniture allowance" of $9,122. Defendants insist they declined to sign these contracts on the basis that the sales price was inflated to enable the buyer to get a better loan and the "cash furniture allowance" was bogus. Defendants insist that at closing, they would have been required to sign a government affidavit swearing that $55,000 was the true purchase price when, in fact, the true purchase price was $55,000 less the bogus furniture allowance of $9,122. Plaintiff insists that the reason the substitute contracts were not accepted by defendants was that defendants had put themselves in a position where they could not accept the substitute contracts because the property had already been conveyed to Mr. Noureddini and Mr. Arab who had put substantial mortgages on the property.

Plaintiff insists that as a result of the breach of the Construction Agreement and the Compromise and Settlement Agreement, it is entitled to receive the benefit of its contract, either the profit under the contract with Dave Rowland or the proceeds actually received in excess of the Construction Agreement costs of $68,550. Plaintiff also insists that it is entitled to damages as a result of each of the individual defendants' fraudulent conveyance of some of the units to themselves and subsequently third parties in an attempt to circumvent their contractual obligation to remit the sales proceeds in excess of the turn-key price to plaintiff.

The defendants have appealed and present seven issues. The first is:

Whether the construction contract is unenforceable for lack of consideration and mutuality of remedy.

(a) As to original construction Agreement,

(b) as to the Compromise and Settlement Agreement.

The Chancellor on this issue found as follows:

Because Intercontinental Construction was not obligated to purchase the lots until [plaintiff] had performed its obligation under the Construction Agreement, the purchase of the lots by Intercontinental Construction acknowledges performance by [plaintiff], waives any argument that the Construction Agreement is invalid or lacks mutuality, and estops Intercontinental Construction to deny its obligations under the Construction Agreement.

■ Intercontinental and the individual defendants argue that the Construction Contract "is clearly unenforceable for lack of mutuality." In support of this argument, they cite 17 C.J.S. *Contracts* § 102, which in pertinent part states:

Every building and construction contract must contain the elements of mutuality, that is to say, there must be a twofold obligation, the one on the part of the builder to do the work, and the other on the part of his employer to pay therefor.... As is true with respect to contracts generally, a building and construction contract is lacking in mutuality if only one of the parties is bound to perform, and the rights of the parties exist at the option of one only.

The defendants' mutuality argument boils down to the contention that plaintiff's obligations and risks under the Construction Agreement were not equal to the obligations and risks of Intercontinental. Equal consideration is not required. *See Griffin v. Simmons*, 61 Tenn. (2 Baxt.) 19, 21–22 (1872).

■ Defendants were under no obligation to perform under the contract until

such time as the plaintiff brought purchasers to Intercontinental for the purpose of pre-selling the duplex units. Plaintiff was obligated to pre-sell the units. Intercontinental relied on the plaintiff's obligation and did not start construction until the units were pre-sold. It was necessary that plaintiff present investors before Intercontinental was obligated to commence construction, and Intercontinental's obligation to construct the units on the property and transfer the units to investors did not come into being until plaintiff presented the investors.

■ Additionally, even if there was doubt in regard to the existence of consideration for the Construction Agreement, the doubt is resolved by the Compromise and Settlement Agreement. The Compromise and Settlement Agreement recites that there is a dispute concerning the validity of the Construction Agreement and that as a settlement of the dispute, the Compromise and Settlement Agreement was being entered into. Intercontinental was represented by counsel at that time and waived any argument as to consideration by executing the Compromise and Settlement Agreement.

■ The defendants argue that the Compromise and Settlement Agreement is likewise devoid of mutuality.

We disagree. The plaintiff agreed to increase the price payable to Intercontinental for the first ten units of Piccadilly Square. The re-negotiated construction price included payment over and above that which Intercontinental was to receive under the Construction Agreement. There is a valuable consideration for the Compromise and Settlement Agreement.

■ Defendants' second issue is: "Whether the Compromise and Settlement Agreement should be set aside as fraudulently induced."

Under the Construction Agreement, Intercontinental was obligated to build on thirty-five lots. After the differences of the parties arose, plaintiff through its attorneys drafted a Compromise and Settlement Agreement. The Compromise and Settlement Agreement was taken to Intercontinental's attorney, who added paragraph 4 which reads as follows: "It is further agreed that Intercontinental is herewith relieved from the obligation to construct any further buildings or units under the contract of October 28, 1983 and has no further responsibility therefor."

Intercontinental was relieved of its obligation to construct any units other than the ten which were under contract to Dave Rowland.

Defendants insist that plaintiff had already transferred these lots without advising Intercontinental, and that Intercontinental was therefore released from any obligation to construct on the lots regardless of paragraph 4. They insist that if they had known this they would not have entered into the Compromise and Settlement Agreement.

Defendants insist that when Intercontinental added paragraph 4, the plaintiff had an obligation to reveal the information to Intercontinental that plaintiff had already transferred the lots and that Intercontinental was released.

The Chancellor found that

[Plaintiff] did not induce Intercontinental Construction to enter into a Compromise and Settlement Agreement by representing that Intercontinental Construction was obligated to build on more than ten (10) lots but would be released by the Compromise and Settlement Agreement.

Paragraph 4 of the Compromise and Settlement Agreement between Intercontinental Construction and Piccadilly Square was not a material factor which induced Intercontinental Construction to execute the Compromise and Settlement Agreement; therefore, there is no fraud to rescind the Compromise and Settlement Agreement.

The evidence fully supports the Chancellor's finding. The defendants initiated the discussion which resulted in the Compromise and Settlement Agreement. There is nothing in the record to show that plaintiff made any representation regarding development of the additional twenty-five lots.

Fraud is never presumed in the absence of a confidential relationship and the burden of proof is on the party asserting the fraud. *Jackson v. Travelers Ins. Co.,* 403 F.Supp. 986, 996 (M.D.Tenn.1975). A party seeking to rescind a written agreement on the ground of fraud must prove the fraud by a preponderance of the evidence. *Calhoun v. Baylor,* 646 F.2d 1158, 1163 (6th Cir.1981). The record is devoid of any evidence that plaintiff made any statements regarding the ownership of the additional twenty-five lots. We find no active fraud.

While the defendants assert that the plaintiff failed to reveal the fact that the additional lots had been transferred, we find no constructive fraud. The failure to disclose becomes fraudulent only when the parties are bound to disclose facts which materially affect the agreement. *Simmons v. Evans,* 185 Tenn. 282, 286, 206 S.W.2d 295, 296 (1947). The Plaintiff did not owe defendants the duty to disclose facts which were not the subject of the Compromise and Settlement Agreement until the defendants' attorney inserted paragraph 4 of the Agreement.

We concur with the Chancellor's finding that Paragraph 4 of the Compromise and Settlement Agreement was not a material factor which induced Intercontinental to enter into the Compromise and Settlement Agreement. This issue is without merit.

Defendants' third issue is: "Whether Plaintiff failed to furnish developed lots and to pay for the construction of the improvements."

It is defendants' insistence that plaintiff "had an obligation to furnish through its development contractor lots that were in fact, buildable."

We find no evidence in the record, either from the contract between the parties or otherwise, to support defendants' insistence that there was an obligation on the part of plaintiff to furnish "lots that were in fact, buildable." Defendants contracted with Wellington Enterprises, Inc. to purchase the lots in question. Evidence presented by the defendants show they knew at the time they purchased the lots that the property had not been developed.

Nowhere in the record is there evidence to support this issue. This issue is without merit.

The fourth issue presented by the defendants is that the contract violated public policy and was also a contract in restraint of trade.

Defendants argue that the "contract serves to control the cost both to the producer and the consumer for constructed units." They contend that the contract is unlawful and void pursuant to Tenn.Code Ann. § 47-25-101 which provides in pertinent part as follows:

All arrangements, contracts, agreements, ... between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the ... manufacture or sale of articles of domestic growth or of domestic raw material, in all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful and void.

Defendants argue that the contract limits its right to do business and "limits the price demanded for the business."

Intercontinental was contractually restrained only in that it was bound by the Construction Agreement to an established turn-key construction price. This turn-key construction price is to be the price submitted by Intercontinental. If there were price over-runs, Intercontinental would have to bear the risks. We find nothing in the Construction Agreement or anywhere in the record to show there is a violation of Tenn.Code Ann. § 47-25-101. This issue is without merit.

Defendants' fifth issue is: "Whether Defendants are guilty of fraud in transferring the property in order to obtain permanent loans to the units."

The Chancellor found:

The defendants Ali Noureddini and Akbar Arab, individually, received $807,137.32 from their conveyance of nine of the ten lots and duplex townhouse units previously under contract to Dave R. Rowland.

None of the proceeds from these conveyances were forwarded to Piccadilly Square, pursuant to the terms of the Construction Agreement and the Compromise and Settlement Agreement, but rather were diverted by the defendants, Ali Noureddini and Akbar Arab, to their own use.

. . . .

Defendants Ali Noureddini and Akbar Arab knowingly participated in the commission of fraud against the plaintiffs when they caused Intercontinental Construction Company to convey nine of ten lots and duplex townhouse units to them without consideration. The purpose of these acts being to circumvent the obligation of Intercontinental Construction Company to comply with the Construction Agreement and the Compromise and Settlement Agreement. Therefore, Intercontinental Construction Company, Ali Noureddini and Akbar Arab are jointly and severally liable to the plaintiff Piccadilly Square. Thus, Piccadilly Square is entitled to a judgment for the benefit of the bargain of the contract with Dave R. Rowland, the sum being $112,000.00 which represents the total contract price of $877,250.00 for eleven buildings or an average price of $79,750.00 per building times the ten (10) buildings constructed minus the Compromise and Settlement Agreement cost of $685,500.00.

The preponderance of the evidence fully supports the Chancellor's findings.

The individual defendants were under no circumstances entitled to the proceeds of the sale of the several units. Plaintiff was entitled to the profits over and above the turn-key price. The defendants received $807,000.00 from a project for which Intercontinental was contractually bound to accept $685,500.00.

This issue is without merit.

Defendants' sixth issue is: "Whether the Trial Judge was in error in refusing to grant a new trial because of the long delay in rendering an opinion."

Defendants argue that since the trial of this case began on 29 September 1986 and an opinion was not rendered until August 1988, "the Court could not possibly recall the factual allegations sufficiently to render a fair and impartial hearing...." We would first point out that the delay from 29 September to 2 November 1987 was brought about because of a motion by the defendants to continue the case when they learned of facts which they felt amounted to fraud. When the delay was requested, very little testimony had been presented. The trial was continued until 2 November 1987 and concluded on 3 November 1987 and an opinion was rendered in August 1988.

The defendants have failed to carry their burden of showing that because of the delay from 3 November 1987 to August 1988 they were prejudiced. They do not attempt to do so. They simply contend that "because of the complexity of this case . . ., the Court could not possibly recall the factual allegations...."

Our review of this record shows that the judgment of the Chancellor is correct and was based upon the preponderance of the evidence. The defendants have not shown any prejudice brought about by the delay from November 1987 to August 1988 in filing the Memorandum Opinion.

This issue is without merit.

By their seventh and last issue, defendants argue that "[e]ven if Defendants are liable, ... damages are limited by the provisions of the Contract."

Defendants rely on the following provision:

LIQUIDATED DAMAGES. In the event Joint Venture timely furnishes Contractor with permanent loan take-out letters as set forth in Paragraph 2 hereof, and Contractor fails to acquire the eleven (11) to thirty-five (35) lots as set forth in Exhibit "B" and begin construction of the first eleven (11) buildings within thir-

ty (30) days after receipt of the permanent take-out letters, or breaches any other term or condition of this Agreement, then Contractor shall pay Joint Venture liquidated damages in the amount of $10,000 and any obligations of Joint Venture pursuant to this contract shall immediately become null and void. Contractor through its execution of this Agreement hereby waives any argument, position, or defense it (he) may have in attempting to defeat payment of the $10,000 because of the application of the term of "liquidated damages", be it liquidated damages, contractual damages or otherwise.

The defendants attempt to read something into this provision that is not there. If Intercontinental had failed to acquire the property and begin construction pursuant to the Construction Agreement, then Intercontinental would be obligated to pay plaintiff as "liquidated damages" the sum of $10,000.

This provision does not apply to the facts of this case. Here, the defendant Intercontinental contracted for a turn-key price of $68,500 to build the units and to remit all amounts in excess of the turn-key price to plaintiff. Under defendants' insistence, even if defendants sold the units for thousands of dollars more than the turn-key price and kept those profits for themselves, they could be only liable for the sum of $10,000. The contract clearly does not contemplate the situation that we have here.

This issue is without merit.

The judgment of the Chancellor is affirmed with costs assessed to the defendants and the cause remanded to the Chancery Court for the collection of costs and any further necessary proceedings.

TODD, P.J., and CANTRELL, J., concur.