9 F.3d 1548
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
PLOUGH, INC., Plaintiff-Appellant Cross Appellee,
v.
REI, INC. Defendants-Appellees Cross-Appellants.
 Nos. 92-6031 to 92-6033.
 United States Court of Appeals, Sixth Circuit.
 Nov. 12, 1993.
 
 Before: KEITH, NELSON, and RYAN, Circuit Judges.
 PER CURIAM:
 
 
 1
 Appellant/Cross-Appellee, Plough, Inc. ("Plough") appeals the damage award in the breach of contract action brought by Real Estate Interest, Inc. ("REI") under a trademark license agreement. This appeal follows a jury verdict in favor of REI finding Plough breached the agreement and awarding damages. Appellee/Cross-Appellant, REI, appeals from an the district court's order granting a directed verdict against REI's cross-claim alleging counts of fraud and fraudulent concealment relating to Plough's termination of the trademark license agreement. Upon consideration of the issues presented by this appeal, although we agree that Plough breached the trademark license agreement, we REVERSE and remand to the district court for a rehearing on the issue of damages. We AFFIRM the directed verdict as to the claims of fraud and fraudulent concealment.
 
 I.
 
 2
 Plough, a Delaware corporation with its principal place of business in Memphis, Tennessee, manufactures skin care products, specifically sun-care oils and lotions. Plough possesses two registered trademarks relating to this line of business: the "Coppertone" name and the "Little Girl and Dog" logo. REI, a Georgia corporation, purchased non-applied sun-care technology assets from a now bankrupt corporation. These non-applied sun-care products include fabrics and plastics which allow tanning rays to pass through while blocking the damaging rays of the sun. REI purchased these assets out of bankruptcy in June 1987 and planned to sell the non-applied sun-care products while continuing to develop the technology. Soon after REI acquired the assets, Plough and REI began negotiating and executed a trademark license agreement effective December 31, 1987. Under the terms of the agreement, Plough licensed REI's use of the "Coppertone" name and the "Little Girl and Dog" logo to market certain sun-filtering products.
 
 
 3
 Plough and REI carefully negotiated and jointly drafted the trademark license agreement ("Agreement"). The Agreement provided an initial six-month license term, followed by two 12-month terms. Each party retained the right to terminate the agreement, at-will, at the end of each term, upon 90-days written notice. Both parties drafted the 90-day at-will termination clause and the two other provisions which interact with the early termination clause. First, REI negotiated for, and received, two additional 90-day periods to sell "Coppertone" inventory in the event of early termination. This provision ensured REI a total of 270 days from the date of an early termination notice to dispose of "Coppertone" inventory. Second, REI negotiated for, and received, a provision forbidding Plough to license another company with similar products for one year after an early termination.
 
 
 4
 Plough signed the Agreement on November 20, 1987 but REI did not sign until January 18, 1988. The seasonal nature of sun-care products makes these dates important. The demand for sun-care products begins in early spring and continues through the summer months. A manufacturer's selling season, therefore, begins in the late summer or fall of the previous year. Manufacturers (such as REI) must contact retailers and receive merchandise orders in the late summer or fall to allow sufficient lead time for manufacturing and distribution, and to ensure that their products reach the shelves by May 1 of the current selling season. The Agreement's December 31 effective date gave REI a late start for the 1988 selling season. The two additional 90-day selling periods, however, ensured a full selling season (1989) in the event of early termination.
 
 
 5
 Although REI had no written orders from retailers on the date the parties signed the Agreement, REI immediately contacted national retailers and chain stores to obtain product orders upon execution of the Agreement. REI quickly prioritized the "Coppertone" line and soon produced an inventory of "Coppertone" products. As early as November of 1987, REI supplied Plough with proposed label copy for hang tags and layouts for displays. REI submitted similar proposals again on January 12, 1988 after the Agreement was final. REI clearly anticipated a successful business venture. Unfortunately, between January and April 1988 various disputes arose regarding REI's performance of the Agreement.
 
 
 6
 On April 4, 1988, Plough's vice president, Gordon McDaniel, wrote a letter to REI's president, Steven Spires, listing Plough's grievances. McDaniel noted REI's failure to: (1) make a required $10,000 royalty payment; (2) to begin product distribution by February 1, 1988; (3) to provide reports of net sales after the first quarter; and (4) to certify that it had obtained a $1 million insurance contract. Plough gave REI 30 days to cure the breaches REI either explained or cured all of the problems within the thirty day limitation.
 
 
 7
 Before REI's response to the first letter, however, McDaniel wrote a second letter dated April 8, 1988 ("April 8 letter") which indirectly addressed an underlying tension between Plough and REI. In March 1988, Plough's president, Michael Pietrangelo, became aware of certain language REI was using on labels and hang tags. The language stated: "Enjoy the smart, new way to a luxurious tan-without burning, without the use of messy oils or lotions while in comfortable shade." (emphasis added) Pietrangelo felt these remarks disparaged and could affect the sales of Plough's traditional Coppertone oil and lotion sun-care products. In the April 8 letter, however, Plough contended that certain label copy raised "serious questions" of federal law. The language Plough questioned stated the REI product "screens out the sun's harmful rays;" "allows safe tanning rays through;" enables the user to "tan without burning;" "provides maximum protection from harmful UVB rays;" and that the user could "tan all day without burning." Plough construed this language as potentially "false and misleading" according to certain Food and Drug Administration (FDA) and Federal Trade Commission (FTC) regulations.
 
 
 8
 The Agreement gave Plough the right to review and approve all products and labeling. Any product/label not objected to within 14 days of receipt was deemed approved. Plough never objected to the label copy received in November 1987 and January 1988, thus this copy was deemed approved. The Agreement, however, provided a separate clause stating "[t]he Licensed Products shall be manufactured, sold and distributed in accordance with all applicable Federal, state and local laws." Because Plough felt the aforementioned language raised serious questions about the labels' compliance with federal laws, the April 8 letter instructed REI to discontinue all further sales of "Coppertone" products until any hang-tag discrepancies were settled. Plough also ordered REI to immediately withdraw any products bearing the current labeling from the marketplace.
 
 
 9
 Negotiations and modifications concerning hang-tags continued through May 2, 1988 at which time revised language met with Plough's approval. It is disputed whether, despite the April 8 letter, REI continued to ship and attempt to sell "Coppertone" products. Despite the two letters, REI president Spires, felt the relationship between the two companies was "moving forward." Plough and REI executives met in Memphis on April 14, 1988 to discuss these problems and others. Prior to this meeting, Pietrangelo explained to McDaniel his reservations about Plough's relationship with REI and told McDaniel he was inclined to terminate the License Agreement. REI contends that the April 4 letter exemplifies Plough's attempt to find a way out of the contract and that Plough's only real dispute was the "messy oils and lotions" language.
 
 
 10
 At the April 14 meeting, McDaniel told Spires that Pietrangelo wanted to "get rid of REI." The meeting rehashed Plough's complaints and concluded with McDaniel stating that he would speak to Pietrangelo and see if he could "convince him to change his mind." Despite these blatant statements, Spires later testified that none of these April communications led him to believe Plough would terminate the contract. On May 23, 1988 Plough gave REI written notice of termination. The notice became effective June 1, 1988, the end of the first six-month term after which either party could terminate at will. The contract, therefore, lawfully terminated under the provisions of the contract 90 days later on September 1, 1988. Plough lifted its April 8 "ban" on REI's Coppertone sales by June 27, 1988, which allowed REI to sell their "Coppertone" inventory during the two additional 90-day periods provided in the contract. These additional periods gave REI full selling power for the 1989 season. Due to REI's internal technical problems, however, much of the "Coppertone" inventory remained unsold at the time of trial.
 
 
 11
 On November 9, 1989 Plough filed a complaint for injunctive relief and damages in the United States District Court for the Western District of Tennessee. Plough alleged REI had wrongfully infringed trademarks registered to Plough in violation of the Federal Trademark Act, 15 U.S.C. §§ 1051-1127. Plough charged REI with unfair competition and unfair trade practices and also alleged that REI breached the 1988 trademark license agreement resulting in damages. The district court issued a preliminary injunction on November 13, 1989, by consent of the parties, prohibiting REI from using Plough's trademarks or engaging in unfair competition. On February 25, 1992, again by consent of the parties, the district court issued a permanent injunction and Plough voluntarily waived its damages and attorneys' fees claims.
 
 
 12
 The case proceeded to trial based on REI's February 15, 1990 counterclaim alleging Plough had violated the trademark license agreement and seeking $3.5 million in damages for breach of contract and breach of implied duty of good faith and fair dealing. On March 8, 1990 Plough filed an answer denying REI's allegations. Discovery followed during which the district court twice sanctioned REI for failure to comply with orders compelling discovery of documents supporting of REI's damage claim.
 
 
 13
 In response to REI's counterclaim, Plough filed a motion for summary judgment. REI then moved to amend its counterclaim seeking to add counts of fraud and fraudulent concealment and a prayer for an unspecified amount of punitive damages. The district court denied Plough's motion for summary judgment and, over Plough's objection, allowed REI's amended counterclaim. Plough filed an answer denying the counterclaim's allegations. In the order denying Plough summary judgment, the district court found that although no issue of material fact existed as to Plough's lawful termination of the Agreement by written notice on May 23, 1988, a discrepancy did exist with regard to Plough's April 8 letter and ban on REI's sales of Coppertone products. Before trial, Plough filed five motions in limine concerning REI's proof of damages.
 
 
 14
 A four day jury trial commenced on February 24, 1992. At the conclusion of REI's proof, Plough moved for a directed verdict. The district court granted a directed verdict against REI for its fraud and fraudulent concealment counts but denied the motion for the contract claims. Plough also moved to strike various damage claims. The district court found that REI failed to provide sufficient evidence to support recovery of punitive damages. The court, however, submitted REI's claims of breach of contract, and breach of implied duty of good faith and fair dealing, to the jury with instructions as to all of REI's compensatory damage claims.
 
 
 15
 The jury returned a verdict in favor of REI awarding damages of $910,579.48. On March 13, 1993, the district court entered judgment on the jury verdict in the same amount. Plough filed a motion for judgment as a matter of law or, in the alternative, for a new trial or remittitur. The district court denied the motion for judgment as a matter of law but granted Plough's motion for remittitur, or new trial if REI would not agree to a remittitur. Specifically, the court found that $327,700 of the damage award improperly represented a loss of gross profits which are not recoverable as a matter of law, and were not proven with sufficient certainty to sustain a verdict.
 
 
 16
 REI accepted the remittitur, reserving the right to cross-appeal if Plough appealed. On July 15, 1992 the district court entered final judgment in the amount of $582,879.48 plus interest. This timely appeal and cross-appeal followed.
 
 II.
 
 17
 On appeal, Appellant/Cross-Appellee Plough argues its April 8 letter did not breach the Agreement because REI's label copy raised "serious questions" of compliance with federal laws and the selling ban was soon lifted. Plough also argues that the damages sought by REI, and awarded by the jury, were not shown with reasonable certainty to have been directly and proximately caused by the April 8 breach. In addition, Plough contends the district judge's jury instruction, which included a reference to REI's ad damnum clause, was unfairly prejudicial and constituted reversible error.
 
 
 18
 Appellee/Cross-Appellant REI argues the district court erred in ordering the remittitur of the lost profit portion of the damages award. Specifically, REI contends that the remittitur was actually a judgment as a matter of law and that the district court's ruling was erroneous. REI also argues that the district court erred in granting Plough a directed verdict on REI's claims of fraud and fraudulent concealment. We discuss these issues in order below.
 
 A.
 
 19
 An analysis of REI's proof of damages must begin with the question of whether the April 8 letter and ban of REI's "Coppertone" sales constituted a breach of the Agreement. The jury found the April 8 letter breached the 14-day notice provision for objections to label copy. Specifically, the jury found that Plough received REI's label-copy in November of 1987 and again on January 12, 1988 and did not disapprove of such copy. The contract specifically provided that:
 
 
 20
 If licensee does not receive written notice of disapproval within fourteen (14) days after receipt of samples or other materials, the licensor shall be deemed to have approved the same.
 
 
 21
 If Plough disapproved of the hang-tag copy it was contractually obligated to notify REI within the 14-day period. The parties do not dispute that although Plough received the hang-tag copy by, at the latest, January 12, 1988, no objections to nor questions regarding such copy were raised until April, well after the 14-day period.
 
 
 22
 Further, Plough's argument that REI's label copy violated federal law is without merit. The only proof regarding this claim is the statement by one of Plough's lawyers that the copy raised "serious questions." No firm allegations were made and no proof offered of any FDA nor FTC violations. The label-copy was deemed accepted 14 days after receipt, thus the April 8 letter breached the Agreement.
 
 B.
 
 23
 Neither party disputes Plough's proper termination of the Agreement. Plough gave written notice of termination on May 23, 1988, effective June 1, 1988. According to the unambiguous contract terms, the Agreement lawfully terminated 90-days later on September 1, 1988. Any damages suffered by REI must relate to the April 8 breach and can not relate to the subsequent lawful termination. Plough, in fact, concedes REI would be allowed to recover damages which it showed were unavoidably and proximately incurred after receiving the April 8 letter but before Plough's admittedly proper notice of termination.
 
 
 24
 Plough first argues that every expense REI chose to incur, before, during and after the breach was not proximately caused by Plough's conduct and, as such, Plough should not bear the burden of REI's bad business decisions. Plough also claims that REI's damage evidence consisted solely of crude and inaccurate allocations made by REI's president Spires, which do not rise to the level of certainty required by Tennessee law. At trial Spires testified about REI's damages resulting from the April 8 letter. His calculations and testimony included pre-contract expenses, pre-breach expenses, post-termination expenses and lost profits. To no avail, Plough demanded substantiating business records. Plough contends that no documents exist upholding Spires' claims. Plough further argues the lack of substantiating evidence rendered the evidence presented insufficient to warrant a damage award.
 
 
 25
 Tennessee law governs the level of proof required for an award of damages. According to Tennessee law, "the purpose of awarding damages in breach of contract actions is to compensate for damages actually incurred by placing the plaintiff in the position he would have occupied had the contract been fulfilled in accordance with its terms." Grantham & Mann, Inc. v. American Safety Products, Inc., 831 F.2d 596, 601 (6th Cir.1987) citing Corporate Air Fleet of Tennessee, Inc. v. Gates Learjet, Inc., 589 F.Supp. 1076, 1082 (M.D.Tenn.1984) (other citations omitted). The injured party is not to be put in a better position than would have been enjoyed had the party fully performed the contract. Wilhite v. Brownsville Concrete Co., 798 S.W.2d 772, 775 (Tenn.Ct.App.1990). The plaintiff bears the burden of proving damages, Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 392 (6th Cir.1962) cert. denied, 372 U.S. 907 (1963), and without adequate proof, there can be no award of damages in any amount. See Cecil Corely Motor Co. v. General Motors Corp., 380 F.Supp. 819, 858 (M.D.Tenn.1974); Inman v. Union Planters Nat'l Bank, 634 S.W.2d 270, 272 (Tenn.Ct.App.1982).
 
 
 26
 The district court stated that REI was "entitled to recover the costs of all material irrevocably identified to the Coppertone contract, even if those materials were purchased prior to the date of the breach or the date of the contract" (R. 88; Order on Post-Trial, at p. 4). This broad assertion misstates the law. Causation must be established before a plaintiff may recover damages in a breach of contract action. The plaintiff is entitled to recover only those damages proven to be directly and proximately caused by the defendant's breach. Hogan v. DiCicco, 1991 WL 139719 at * 5 (Tenn.Ct.App., July 31, 1991). Damages remotely or consequentially resulting from a breach, or speculative damages, may not be recovered. Central Nat'l Ins. Co. v. Horne, 326 S.W.2d 141, 146 (Tenn.Ct.App.1959). The plaintiff must lay a foundation "enabling the triers of fact to make a fair and reasonable assessment of damages." Airline Construction, Inc. v. Barr, 807 S.W.2d 247, 274 (Tenn.Ct.App.1990). Where this burden has not been met, the court must deny or reduce an award accordingly. Massman Construction Co. v. Tennessee Valley Authority, 769 F.2d 1114, 1123 (6th Cir.1985), cert denied, 476 U.S. 1104 (1986). Thus, in Tennessee a plaintiff must prove damages with some reasonable certainty.
 
 
 27
 REI is only entitled to recover those expenses proximately resulting from the April 8 breach, not from the lawful termination nor any expenses incurred in normal performance of the contract. REI, therefore, may not recover expenses unrelated to the April 8 breach which would have been incurred in the normal course of business. At most, REI is entitled to costs associated with the hang-tag problem or the temporary selling ban addressed in the April 8 letter. REI had the burden of proving these costs with reasonable certainty. We find no proof in the record that many of the expenses REI claimed, which were submitted to the jury, would not have been incurred in absence of the breach.
 
 
 28
 On June 8, 1988 Spires wrote a letter to McDaniel estimating that REI's "Coppertone" expenses totaled $325,940. By trial, this figure jumped to $669,445.30. Spires testified that the original figure was not based on any extensive review of REI's financial records. He explained that in preparation for trial he examined REI's cancelled checks for the time-period of July 16, 1987 to August 10, 1989 and allocated portions of those payments to the "Coppertone" project. Although REI had accounts separate from "Coppertone," REI presented no internal documents detailing any actual distribution of the purchased materials into various product lines. Admittedly, Spires relied almost entirely upon his memory when allocating expenses. The record reflects no documents nor testimony detailing an accurate allocation.
 
 1.
 
 29
 REI claimed that the April 8 breach resulted in $669,445.30 in damages. A close examination of the record belies this conclusion. For instance, REI incurred $132,210.39 before December 31, 1987, the effective date of the contract. REI would have incurred these development costs whether or not the contract had actually come to pass. These costs certainly are not the proximate result of an April 8 breach. This Circuit has held that precontract expenses are routinely disallowed. Wells v. 10-X Mfg. Co., 609 F.2d 248, 257 (6th Cir.1979) (product development costs disallowed).
 
 2.
 
 30
 A non-breaching party must prove that direct out-of-pocket expenses are the direct and proximate result of the other party's breach in order to recover such expenses. First Tennessee Bank, N.A. v. Hurd Lock & Mfg. Co., 816 S.W.2d 38, 43 (Tenn.Ct.App.1991). Because Plough's breach consisted of the April 8 letter, no expenses incurred between the commencement of the contract and before the breach were directly and proximately caused by the breach. REI, however, allocated $219,939.88 of damages for the time period between December 31, 1987 to April 8, 1988, stating that these costs were a proximate result of the April 8 breach.
 
 3.
 
 31
 Further, REI failed to provide sufficient evidence that any expenses incurred after the April 8 breach were directly and proximately caused by the breach. REI presented insufficient evidence that any business decisions were made because of the April 8 letter. In fact, REI admits that although on April 14 McDaniel told Steven Spires that Plough's president wanted to "get rid of REI," REI felt the relationship would continue and made decisions accordingly. REI was fully aware that Plough could legally terminate the contract, by giving notice, as early as June 1, 1988. REI made no showing that it produced, sold or distributed any goods that it would not have produced, sold or distributed absent Plough's letter. REI actually incurred close to $300,000 in expenses after this "breach" and according to REI's damage calculations, approximately $50,000 in damages were incurred after the September 1 termination date.
 
 
 32
 REI argues it committed to these expenses prior to the termination and the costs were somehow related to the April 8 breach. Regardless of when REI committed to these costs, REI must prove that such costs were incurred as a direct result of Plough's letter to recover such amounts. REI sought full reimbursement for all products ordered before Plough's April 8 breach, even if these expenses would necessarily have been incurred in normal performance under the trademark license agreement. REI has made no showing of a direct and proximate relation to the April 8 letter. The non-breaching party may not be put in a better position than it would have occupied if the contract had been fully performed. See Wilhite, 798 S.W.2d at 775.
 
 4.
 
 33
 REI also sought damages resulting from their inability to resell Coppertone products at full market value, or at all. The Agreement, however, specifically provided two 90-day post-termination periods within which to sell the inventory. It is unclear whether REI sold any inventory (according to Plough, REI sold $82,565 in inventory after the time of the breach). There is no proof, however, that any stockpiling of unsold inventory related to the April 8 letter and was not a result of REI's poor planning in the face of an imminent termination.
 
 
 34
 Clearly REI should recover any expenses related to changing the ad copy in response to Plough's breach and any damages proven to have resulted from the temporary selling ban which occurred before the notice of lawful termination. Upon notice and subsequent termination, REI was required to rely upon the safeguards the Agreement provided in case of such an early termination. The April 8 breach gives rise to artwork expenses and travel expenses related to changing the ad copy. These expenses are not proven with reasonable certainty in the record. REI provided no detailing of costs related to attending meetings for the hang-tag problems; REI presented no travel or long distance costs and no costs directly related to changing the hang-tags.
 
 5.
 
 35
 Lawful termination occurred on June 1, 1988. The damage award, however, included substantial sums expended had there never been a breach on April 8 and REI would not have been entitled to these expenses at all once the contract lawfully terminated. Although REI argued that these expenses represented invoices committed to before the breach, there is no proof that these costs would not have been spent and unrecoverable in the face of a lawful termination. There is no substantial evidence presented that the damages which the jury heard and awarded were proximately related to the April 8 breach. Based on the foregoing we find that REI failed to prove the damages awarded were directly and proximately caused by Plough's April 8 breach. We therefore REVERSE the judgment as to damages and remand for a rehearing on this issue.
 
 C.
 
 36
 We reverse the damage award because REI's proof was clearly deficient. We therefore decline to reach the propriety of the reference to the ad damnum clause and the order of the remittitur.
 
 D.
 
 37
 Appellee/Cross-Appellant, REI, argues the district court erred in granting a directed verdict against REI on its claims of fraud and fraudulent concealment. Specifically, REI claims that Plough's president, Pietrangelo, ordered McDaniel to terminate the contract in late March 1988, and that Plough fraudulently concealed the decision from REI until late May 1988. The district court found REI produced insufficient evidence to support a fraudulent concealment claim. The court noted first: (1) there was no duty to disclose; (2) there were no fraudulent misrepresentations on Plough's part; and (3) no evidence was presented proving a prima facie case of fraud. In its order, the district court stated:
 
 
 38
 There was no duty [by Plough] in this case [to disclose to REI its intention to terminate the contract] because these parties were both corporations, both involved sophisticated businessmen at arm's-length negotiations.... This was an arm's-length contract and there was no fiduciary relationship between them ... [T]here was no forced bargaining such as you have with an insurance contract.... There was no duty to disclose.
 
 
 39
 (TR IV at p. 796).
 
 
 40
 Under Tennessee law a plaintiff must prove five elements to succeed in a fraudulent concealment claim:
 
 
 41
 (1) The defendant must have concealed of suppressed a material fact;
 
 
 42
 (2) The defendant must have been under a duty to disclose the fact to the plaintiff;
 
 
 43
 (3) The defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff;
 
 
 44
 (4) The plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed facts;
 
 
 45
 (5) As a result of the concealment or suppression of fact, the plaintiff must have sustained damages.
 
 
 46
 Tennessee Pattern Instructions-Civ., § 8.45 (citations omitted.)
 
 
 47
 The district court properly directed a verdict against REI because there was no duty to disclose and there was no concealment of any material facts.
 
 
 48
 Liability attaches only if the defendant had a duty to disclose the matter in question. Macon City Livestock Market v. Kentucky State Bank, 724 S.W.2d 343 (Tenn.Ct.App.1986). A duty to disclose arises in three distinct situations: (1) if a previous fiduciary relationship existed between the parties; (2) where one or each of the parties to the contract expressly reposed trust and confidence in each other; and (3) where the contract or transaction is inherently fiduciary and calls for perfect good faith. Id. at 349; see also Picadilly Square v. Intercontinental Construction Co., Inc., 782 S.W.2d 178 (Tenn.Ct.App.1989) (holding no fraud where no duty to disclose existed). Plough had no duty to disclose its intent to terminate. REI and Plough are two sophisticated business entities who engaged in arm's-length negotiations. There was no previous fiduciary relationship nor was the relationship inherently fiduciary. Because no duty existed, the fraudulent concealment claim must fail.
 
 
 49
 In addition, as early as April 14, Plough informed REI that Plough's president wanted to "get rid of REI." This disclosure occurred just weeks after REI alleges that Plough "decided" to terminate. Quite apart from Plough's lack of duty to REI, a plaintiff claiming fraudulent concealment must prove that the defendant concealed or suppressed a material fact, and that the plaintiff was unaware of the fact. Here, in addition, there was no concealment. REI knew Plough was considering termination of the contract. We, therefore, conclude the district court properly granted the directed verdict against REI and we affirm.
 
 III.
 
 50
 For the foregoing reasons, we REVERSE the damage award and remnd for a rehearing on this issue. We, however, AFFIRM the district court's grant of a directed verdict against REI for its claims of fraudulent concealment.