MACON COUNTY LIVESTOCK
MARKET, INC. and Jimmy
Doss, Plaintiffs/Appellants,

v.

KENTUCKY STATE BANK, INC.,
Defendant/Appellee,

and

Steve Holmes, Defendant.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

April 2, 1986.

Permission to Appeal Denied by
Supreme Court Feb. 2, 1987.

Charles R. Ray, Barrett & Ray, Nashville, for plaintiffs/appellants.

James W. Chamberlain, Lafayette, Stephen C. Todd, Bowling Green, Ky., Secrest & Secrest, Scottsville, Ky., for defendant/appellee.

## OPINION

KOCH, Jr., Judge.

This appeal arises out of a dispute between the owner of a failed livestock market and his former business associate. The owner filed this action following the demise of the business in the Chancery Court for Macon County against his former associate and the bank where his associate maintained his separate accounts. He alleged, in part, that the bank had caused his business losses by failing to inform him of his associate's precarious financial condition. The plaintiff's action against the bank was dismissed in an order entered on January 7, 1985 granting the bank's motion for summary judgment. The plaintiff has perfected this appeal. For the reasons stated herein, we affirm the trial court.

### I.

The parties engaged in a lengthy discovery process before the trial court granted the bank's motion for summary judgment. In the two years between the time the complaint was filed and the time it was

dismissed, they deposed sixteen witnesses.[1] The following material facts emerge from this evidence.

Jimmy Earl Doss is a native of Macon County, Tennessee. Macon County shares its northern border with Allen County, Kentucky. Doss operated retail tire stores in Lafayette, Tennessee and Scottsville, Kentucky for a number of years. He moved to Scottsville in 1978. Later he sold his Tennessee tire store to concentrate on operating the Scottsville Tire Exchange. He had no experience in the cattle business prior to the events that give rise to this dispute.

Doss first became acquainted with Steve Holmes as one of the customers of his tire business. Holmes operated a livestock business in Scottsville known as Holmes Livestock, Inc. Doss and Holmes became good friends during their twelve year association. Holmes was reputed to be quite knowledgeable about cattle. He had been convicted of a felony in 1978 stemming from a cattle transaction in Carthage, Tennessee. Doss was aware of Holmes' conviction but gave him the benefit of the doubt.

Both men maintained separate banking relationships with the Kentucky State Bank in Scottsville. Doss' banking relationship with the Kentucky State Bank began when he moved to Scottsville. Normally, he dealt with the bank's president, James A. Lones. He was considered to be a good customer.

Holmes had also been a customer of the Kentucky State Bank for a number of years. He dealt primarily with the bank's executive vice president, James R. Steenbergen. Holmes had borrowed substantial sums from the bank to operate his cattle business. The bank began to watch him more closely in 1978 following his criminal conviction in Tennessee.

The bank changed its operating policy with regard to checking account overdrafts in 1979. As a result of this change, the bank began to monitor the accounts of customers who frequently overdrew their checking accounts in large amounts. Holmes was one of the customers whose accounts were monitored. At first, when overdrafts were discovered, the bank would call Holmes to inform him that large checks had been presented for payment without sufficient funds in his account. Like other customers, Holmes was given the opportunity to make an immediate deposit to cover the check before it was returned to the payee because of insufficient funds. This happened with such frequency with Holmes' account that Holmes and Steenbergen eventually agreed that Holmes would call the bank, almost on a daily basis, to discover how much was needed to cover the checks he had already written. He would then go to the bank each day to deposit enough money to cover the checks that had been presented for payment.[2] On days when Holmes could not make the necessary deposits, the Kentucky State Bank began to make him short-term loans to cover the checks that had been presented.[3] Holmes was able to repay these loans within three or four days after they were made.

Lones did not think that Holmes was a good customer even though Steenbergen thought he was satisfactory. Despite its uneasiness about Holmes, the bank did not consider closing his accounts because it wanted to give Holmes a chance to repay

1. The discovery documents filed with the trial court, excluding the answers to the written interrogatories, included twenty-six depositions taken in this case as well as certain depositions and proceedings in related state and Federal cases. These documents comprise a 2,156 page record. Each primary witness was required to give testimony on four separate occasions. Steve Holmes was deposed five times.

2. Many of the deposits Holmes made beginning in 1981 consisted of checks made payable to others drawn on the Macon County Livestock Market's custodial account at the Citizens Bank of Lafayette. Holmes explained that he received many such checks in the course of his business. The Kentucky State Bank knew that the checks were good because they had been written on the livestock market's custodial account. They accepted checks after verifying their customer's second endorsement.

3. The bank made 245 such loans to Holmes between January, 1977 and May, 1982.

the money he had borrowed. Thus, as long as Holmes continued to make sufficient deposits to avoid overdrawing his accounts and to repay his short-term loans, the bank continued to do business with him.

The livestock market in Lafayette, Tennessee was put up for sale in 1980. Holmes approached Doss in the Fall of 1980 with the proposition that they buy the livestock market and go into the cattle business together. Notwithstanding the stories he had heard about Holmes, Doss decided to go into business with his friend. He sought advice from no one about this idea even though he knew nothing about the livestock business.

The Macon County Livestock Market, Inc. was incorporated in Tennessee on November 18, 1980. Doss was the president, Holmes the vice president, and Donald Ray Gibbs the secretary/treasurer.[4] Each original incorporator agreed to furnish $10,000 for the initial capital and to obtain the remaining funds from the Citizens Bank of Lafayette where Doss had done business when he lived in Tennessee.

Doss borrowed his $10,000 capital contribution from the Kentucky State Bank. Doss told Lones at the time he borrowed the money that this was one of the "finest deals he had ever got into." He did not seek Lones' opinion about Holmes or the wisdom of this venture. Lones did not volunteer any information about Holmes.

The three incorporators then met with Charles E. Darnell, the president of Citizens Bank of Lafayette, to work out the details of the loan for the additional funds needed to operate the market. Darnell was knowledgeable about the cattle business. While he knew Doss, he was not acquainted with either Holmes or Gibbs. Thus, Darnell decided to look into their background before he agreed to make the loan. Although the Kentucky State Bank apparently told Darnell that Holmes was a satisfactory customer, Darnell discovered

that Holmes had been in financial and criminal trouble.

Notwithstanding this information, Darnell decided to loan the funds to the livestock market on the strength of Doss' reputation as well as Holmes' estimate that the loan could be repaid within two or three years if the market was able to sell 400 to 500 cattle each week.[5] However, he put several conditions on this loan in light of what he had discovered about Holmes' background. The bank required, and the parties agreed, that Doss would have the primary responsibility for the financial management of the business. Holmes was responsible for developing the business, locating the cattle to be sold at the market and assisting in the weekly sales. However, Holmes was not to be given any independent access to the funds of the corporation. The corporation also agreed to maintain all of its accounts with the Citizens Bank of Lafayette. The Kentucky State Bank played no role in the formation of this business or in its operation other than to make an individual loan to Doss for his share of the initial capital.

Doss did not publicize his involvement with the livestock market because he was concerned that it might affect his tire business. However, acquaintances warned him repeatedly about doing business with Holmes after it became known that he and Holmes were operating the livestock market. Doss later admitted that he discounted these warnings because he thought he knew more than the others did.

The success of the livestock market was directly related to the number of cattle being sold at the weekly livestock auctions. The market received a commission for each head of cattle sold and was able to sell between 450 and 550 head of cattle each week from the day it opened. Thus, the business prospered. Holmes traveled throughout Tennessee and Kentucky finding cattle to be sold at the market. However, he also continued to be active in his own livestock business headquartered in

---

4. Doss and Holmes bought out Gibbs' interest in the market on February 17, 1981 and operated the business as equal owners thereafter.

5. The market had been selling approximately two hundred cattle a week under its previous ownership.

Scottsville. In order to help maintain the sales volume at the market, Holmes, on behalf of Holmes Livestock, Inc., agreed with Doss that all the cattle his company purchased in the area would be sold at their livestock market rather than other available markets.[6]

The Macon County Livestock Market, like other regulated markets, was required to adopt certain business procedures designed to maintain the solvency of the market. The market was required to pay persons selling cattle at the market immediately on the day of sale. These payments were made from the market's bonded custodial account. The market was required to maintain funds in this account that would be sufficient to pay the sellers immediately after their cattle were sold.[7] Buyers were generally required to pay for their cattle immediately after the sale and were not permitted to remove the cattle from the market until payment had been made. However, it was a common practice at this and other livestock markets to permit large, well established buyers to purchase cattle on "open account." Persons accorded this privilege were permitted to remove the cattle they had purchased and to remit payment to the livestock market several days later as long as they maintained a record of prompt payment.

Doss was aware from the beginning that Holmes was purchasing cattle in the name of Holmes Livestock, Inc. at the market's weekly livestock sales. At first, like most other buyers, Doss required Holmes to pay for the cattle he purchased before he was permitted to remove them from the market. Soon, however, Doss began to permit Holmes to purchase cattle on open account. Thus, Holmes was able to remove the cattle before he paid for them.

Initially, Holmes was able to make prompt payment for the cattle he purchased. As time passed, however, he began to take longer and longer to pay for the cattle. Finally, he informed Doss that he was unable to pay for the cattle he was buying. Instead of discontinuing his "open account" privileges, Doss agreed to loan Holmes funds from the livestock market's operating account. Holmes agreed that these funds would be used to pay the market for the cattle Holmes was buying. In return for Doss' agreement to make these loans, Holmes agreed that he would be solely responsible for any losses when the cattle were subsequently sold and that he would split any of his profits with Doss.

At first, the loans Doss made to Holmes were small, and Holmes repaid them promptly. However, in time, these loans increased in size, and Holmes became less able to repay them. This matter came to a head in July, 1981 when Doss and Holmes had a serious argument about Holmes continuing to buy cattle at the market. Doss recalled the confrontation as follows:

What caused the meeting to start with is when I kept telling him [Holmes] if he didn't quit buying so many of these cattle in the yard, I was going to quit loaning him money, and I did. I walked in the yard on Wednesday night after the sale was over, and I told him—I said I've loaned you the last dollar to buy the last track. And he said well, we just as well close the yard, and I said, buddy, when you get your cattle out, lock the door. I said I ain't signing another check.

\* \* \* \* \* \*

Yeah. But then he said I can't get them all out tonight, can you meet me back over here in the morning, which would be Thursday morning. I said what time. And he told me, and I met him back there. We went around and around again, and I said lock it up. I'm done. You've done all you're going to do to me, boy.

A short time later, Holmes admitted to Doss that he was responsible for their problems and asked Doss to give him a

---

6. The extent of Holmes' involvement in his own livestock business and its impact upon the livestock market was not fully known by his business associates until the market began to fail.

7. In accordance with their agreement with the Citizens Bank of Lafayette, Doss was the only person authorized to sign checks drawn on the Macon County Livestock Market's custodial account.

chance to work them out. After consulting with the Citizens Bank of Lafayette, Doss agreed and permitted Holmes to resume buying cattle on open account. Doss never discussed this problem with the Kentucky State Bank.

Doss claimed later that he permitted Holmes to purchase cattle on credit because he was unaware of the precarious position of Holmes' livestock business. Doss recalled that Holmes bragged frequently that he had a special, favored relationship with the Kentucky State Bank. According to Doss, Holmes bragged that he could tell the bank to hold checks presented for payment until there were sufficient funds in his account and that he could obtain unsecured loans whenever he needed the money. He also bragged that he went to the Kentucky State Bank every day to take care of the checks being held there for him. He claimed that the bank always honored his checks and that he had never had a check returned. Doss never asked the Kentucky State Bank about the accuracy of Holmes' statements.

Doss and Holmes continued their uneasy relationship until the latter part of 1981. Holmes was continuing to purchase cattle at the livestock market on open account and borrowing money to pay for them. Finally, the Kentucky State Bank began to return the checks Holmes had written to repay the loans Doss had made which enabled Holmes to purchase cattle. This caused Doss and Holmes to have another argument culminating in Doss' agreement to acquire Holmes' interest in the livestock market. As part of this agreement, Holmes executed a promissary note to Doss in the amount of $246,697.07 which represented payment for cattle Holmes had not yet paid for, repayment of loans made to enable Holmes to purchase cattle, and to cover two earlier checks that had been returned for insufficient funds. At the time Doss severed his relationship with Holmes in November, 1981, Holmes had purchased approximately $1,275,000 worth of cattle at the market, and Doss had loaned Holmes approximately $2,881,000 of corporate funds to assist him in his business.

It was at this time that Doss discovered that Holmes had been engaging in other questionable practices at the livestock market. From the opening of the livestock market, Holmes had not only been soliciting others to sell their cattle at the market, but he had also been buying large numbers of cattle himself and then selling them through the market either in the name of the person from whom he had purchased the cattle or in a fictitious name. He would then purchase these cattle in his own name on his open account. Holmes would not pay for these cattle immediately after the sale. However, under the pretext of making sure that the sellers were paid for their cattle, Holmes would obtain from Doss the market's checks drawn on its custodial account and made payable to the purported sellers. Rather than delivering these checks to the purported sellers, and unbeknownst to Doss, Holmes would endorse the checks with the purported sellers' names and then deposit the checks in his own company's account in the Kentucky State Bank. He would then use these funds to pay debts he had already incurred. He used the money to cover the checks he had already written to the farmers from whom he purchased the cattle originally. He would also use the money to cover the checks he had written to the livestock market to pay for the cattle his company was purchasing or to repay the money he had already borrowed from Doss. By selling the cattle at the weekly sales through assumed names, Holmes later conceded to Doss that he was, in effect, selling cattle to himself while the livestock market made a commission on each sale.

Holmes' scheme completely unraveled in November, 1981 when a farmer complained to the market that he had not been paid for his cattle that had been sold at the market. A search of the market records revealed to Doss, the Kentucky State Bank, and the Citizens Bank of Lafayette that Holmes had endorsed the payee's name and had deposited these funds in his account at the Kentucky State Bank. While the Kentucky State Bank had received and deposited many similar checks in Holmes' account without question, the

bank questioned him about this particular check. Holmes and the named payee told the bank that Holmes had been authorized to sign the payee's name on the check and to use the funds as a loan. The Kentucky State Bank accepted this explanation and did not pursue the matter further after the owner of the cattle received his money.

While Doss had discussed Holmes' activities with the president of Citizens Bank of Lafayette on several occasions, he never discussed them with any representative of the Kentucky State Bank until he discovered that Holmes had been selling his own cattle under the name of fictitious sellers. During this entire period, neither the Kentucky State Bank nor the Citizens Bank of Lafayette communicated with each other about Holmes' activities even though both of them had some concern about the way he was conducting his business. Doss did not seek advice from the Kentucky State Bank during the entire time he was in business with Holmes. Nor did the Kentucky State Bank volunteer information about the status of Holmes' accounts to Doss or anybody else.

Holmes' accounts at the Kentucky State Bank became inactive in May, 1982. This action was filed at that time. In July, 1983, Holmes filed a bankruptcy petition in Kentucky and later that year was adjudged bankrupt. The Kentucky State Bank, Doss, and the Macon County Livestock Market were listed among Holmes' creditors in this proceeding.

The Kentucky State Bank filed its motion for a summary judgment on October 12, 1984. The motion was heard on October 26, 1984. On January 7, 1985, the trial court entered an order granting the bank's motion and dismissing the complaint as it pertained to the bank. The trial court also entered an order on February 15, 1985 denying the plaintiffs' Tenn.R.Civ.P. 59 motion to alter or amend the judgment and granting a final judgment in the bank's favor in accordance with Tenn.R.Civ.P. 54.-02.

## II.

The trial court used a Tenn.R.Civ.P. 56 summary judgment as the vehicle to dis- miss the plaintiffs' complaints against the Kentucky State Bank. Thus, rather than employing the now familiar Tenn.R.App.P. 13(d) standard of review, we must review the record to determine whether the requirements of Tenn.R.Civ.P. 56 have been met. *Hill v. City of Chattanooga*, 533 S.W.2d 311, 312 (Tenn.Ct.App.1975). While summary judgments should not be used as substitutes for the trial of disputed factual issues, *Jones v. Home Indemnity Insurance Co.*, 651 S.W.2d 213, 214 (Tenn.1983), they can provide an appropriate and efficient means to dispose of cases that can be decided on legal issues alone because there are no material disputed facts. *Brookins v. The Round Table, Inc.*, 624 S.W.2d 547, 550 (Tenn.1981); *Poppenheimer v. Bluff City Mobile Homes, Division of Bluff City Buick Co.*, 658 S.W.2d 106, 110 (Tenn.Ct. App.1983).

The existence of disputed, material facts will preclude using a summary judgment as a dispositional tool. *Executone of Memphis, Inc. v. Garner*, 650 S.W.2d 734, 736 (Tenn.1983) and *Evco Corporation v. Ross*, 528 S.W.2d 20, 25 (Tenn.1975). However, not all factual disputes will prevent granting a summary judgment. In order to render a summary judgment improper, the disputed facts must bear directly and materially upon the legal elements of the claim or defense being tested by the summary judgment motion. While there are many points of disagreement between the parties, we have determined that they do not involve facts that are material to the legal basis of the plaintiffs' claims against the Kentucky State Bank.

## III.

The plaintiffs' claims against the Kentucky State Bank are premised upon the bank's failure to disclose, without being requested to do so, information concerning the accounts of one of its depositors. Specifically, Doss claims that the Kentucky State Bank should have volunteered information concerning Holmes' financial condition as well as his practice of depositing in his own account checks drawn on the live-

stock market's account and made payable to others. Thus, this case calls upon this Court to consider the extent to which a bank may be held liable to third parties for failing to disclose information concerning a depositor's financial condition or the manner in which its accounts are maintained.

■ As a general rule, a party may be held liable for damages caused by his failure to disclose material facts to the same extent that a party may be liable for damages caused by fraudulent or negligent misrepresentations. W. Keeton, *Prosser and Keeton on The Law of Torts* § 106 (5th ed.1984); 37 Am.Jur.2d *Fraud and Deceit* § 146 (1968); and 37 C.J.S. *Fraud* § 16a. (1943). Thus, Restatement (Second) of Torts § 551(1)(1976) provides:

> One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

Our courts have pointed out consistently that liability for nondisclosure can arise only in the cases where the person being held responsible had a duty to disclose the facts at issue. The Tennessee Supreme Court has held:

> In all cases, concealment or failure to disclose, becomes fraudulent only when it is the duty of a party having knowledge of the facts to discover them to the other party: 2 Pom. Eq., sec. 902. And this author, in the same section says: "All the instances in which the duty to disclose exists and in which a concealment is therefore fraudulent, may be reduced to three distinct classes:
>
> 1. Where there is a previous definite fiduciary relation between the parties.

> 2. Where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other.
>
> 3. Where the contract or transaction is intrinsically fiduciary and calls for perfect good faith. The contract of insurance is an example of this last class."
>
> *Domestic Sewing Machine Co. v. Jackson*, 83 Tenn. 418, 424–25 (1885).

See also *Simmons v. Evans*, 185 Tenn. 282, 285, 206 S.W.2d 295, 296 (1947) and *Dozier v. Hawthorne Development Co.*, 37 Tenn. App. 279, 292–93, 262 S.W.2d 705, 711 (1953). When this standard is applied to the case before us, it becomes evident that the Kentucky State Bank will be liable to Doss only if it had the duty to disclose Holmes' financial condition to him. The facts before us show, without dispute, that this case does not involve one of the special circumstances where the Kentucky State Bank had such a duty.

The application to banks of the general rule regarding liability for the failure to disclose material facts must be considered in light of a bank's generally recognized obligation not to divulge information concerning a depositor's account without the depositor's consent. *Richfield Bank and Trust Co. v. Sjogren*, 309 Minn. 362, 244 N.W.2d 648, 652, n. 2 (1976); *Tokarz v. Frontier Federal Savings and Loan Association*, 33 Wash.App. 456, 656 P.2d 1089, 1092 (1983); *Djowharzadeh v. City National Bank and Trust Company of Norman*, 646 P.2d 616, 619–20 (Okla.Ct.App. 1982); and *Milohnich v. First National Bank of Miami Springs*, 224 So.2d 759, 760–61 (Fla.Dist.Ct.App.1969). See also 10 Am.Jur.2d *Banks* § 332 (1963) and Annot., 92 A.L.R.2d 900 (1963).[8] Generally, a bank/depositor relationship is treated as a debtor/creditor relationship and does not ordinarily impose a duty of disclosure on the bank. *Denison State Bank v. Madeira*, 230 Kan. 684, 640 P.2d 1235, 1243 (1982) and *Hooper v. Barnett Bank of West Florida*, 474 So.2d 1253, 1257 (Fla. Dist.Ct.App.1985). See also Annot., 70

---

**8.** Many jurisdictions have enacted statutes recognizing this obligation. See 12 U.S.C. §§ 3401–3422 (1984) and Tenn.Code Ann. § 45–10–101 *et seq.* Kentucky has enacted no such statute. However, a bank's duty to maintain the confidences of its clients can exist even in the absence of a statute recognizing this policy.

A.L.R.3d 1344, 1347 (1976). However, when confronted with questions similiar to the one before us, other courts have held that in certain circumstances a bank may be liable for its failure to disclose information concerning a customer's account.

The Minnesota Supreme Court, adopting reasoning very similar to that used by the Tennessee Supreme Court in *Domestic Sewing Machine Co. v. Jackson,* defined the circumstances in which a bank could be liable for its failure to disclose information concerning its customer's account. The Court held:

> As a general rule, one party to a transaction has no duty to disclose material facts to the other. However, special circumstances may dictate otherwise. For example:
>
> (a) One who speaks must say enough to prevent his words from misleading the other party. (citations omitted).
>
> (b) One who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party. (citations omitted).
>
> (c) One who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts. (citations omitted).
>
> *Klein v. First Edina National Bank,* 293 Minn. 418, 196 N.W.2d 619, 622 (1972).

See also *Richfield Bank and Trust Co. v. Sjogren,* 309 Minn. 362, 244 N.W.2d 648, 650 (1976); *Hooper v. Barnett Bank of West Florida,* 474 So.2d 1253, 1257 (Fla. Dist.Ct.App.1985); and *Tokarz v. Frontier Federal Savings and Loan Association,* 33 Wash.App. 456, 656 P.2d 1089, 1092–94 (1983).

Other courts have recognized a fourth special circumstance in addition to the three recognized by the Minnesota Supreme Court. These courts have held that a bank may also have a duty to disclose financial information concerning a depositor if the bank has actual knowledge that

its customer is committing fraud. *Richfield Bank and Trust Co. v. Sjogren,* 309 Minn. 362, 244 N.W.2d 648, 651 (Minn.1976) and *Hooper v. Barnett Bank of West Florida,* 474 So.2d 1253, 1257 (Fla.Dist.Ct.App. 1985).

Most courts considering this issue have noted that a bank's liability for nondisclosure generally attaches in situations where the bank itself is a party to the transaction causing the plaintiff's loss or where the injured party actually sought the bank's advice and counsel. They have noted that it is easy to blame a bank after one of its depositors has proven to be a swindler. *Cunningham v. Merchants' National Bank,* 4 F.2d 25, 30 (1st Cir.) *cert. denied,* 268 U.S. 691, 45 S.Ct. 511, 69 L.Ed. 1160 (1925). Thus, the Minnesota Supreme Court held:

> We believe the correct rule to be that *when a bank transacts business with a depositor or other customer,* it has no special duty to counsel the customer and inform him of every material fact relating to the transaction—including the bank's motive, if material, for participating in the transaction—unless special circumstances exist, such as where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying upon the bank so to counsel and inform him. (emphasis added).
>
> *Klein v. First Edina National Bank,* 293 Minn. 418, 196 N.W.2d 619, 623 (1972).

Other courts have also adopted this rationale. *DuShane v. Union National Bank,* 223 Kan. 755, 576 P.2d 674, 679 (1978); *MacKenzie v. Summit National Bank of St. Paul,* 363 N.W.2d 116, 118–119 (Minn. App.1985); and *Pigg v. Robertson,* 549 S.W.2d 597, 600 (Mo.App.1977).

None of the special circumstances recognized by other courts as a predicate to a bank's liability are present in this case. Doss' relationship with the bank, being that of a depositor,[9] did not give rise to a

---

**9.** Banks and their depositors have a debtor/creditor relationship. *Dickson v. Simpson,* 172 Tenn. 680, 687–88, 113 S.W.2d 1190, 1192– 93 (1938) and *American National Bank v. Miles,* 18 Tenn.App. 440, 446, 79 S.W.2d 47, 51 (1934). The Supreme Court of Kentucky recognizes the

fiduciary responsibility on the part of the bank. *Denison State Bank v. Madeira,* 230 Kan. 684, 640 P.2d 1235, 1243 (1982); *Klein v. First Edina National Bank,* 293 Minn. 418, 196 N.W.2d 619, 623 (1972); *Tokarz v. Frontier Federal Savings and Loan Association,* 33 Wash.App. 456, 656 P.2d 1089, 1092 (1983); and *Pigg v. Robertson,* 549 S.W.2d 597, 600 (Mo.App.1977). Doss never consulted the Kentucky State Bank concerning the wisdom of his dealings with Holmes or about Holmes' financial condition. The bank never made any unsolicited representations to Doss concerning Holmes' financial standing, and the bank never had reason to believe that Doss was relying upon it for advice and counsel. On the contrary, Doss concedes quite freely that it was not the bank's representations he relied upon, but rather it was Holmes' boastful statements about his relationship with the Kentucky State Bank and his personal judgment about Holmes.

The Kentucky State Bank was not a party to the transactions that caused Doss' financial difficulties. While it is true that Holmes deposited the plaintiffs' checks in his own account at the Kentucky State Bank, there is no proof that accepting these checks after they had been endorsed by Holmes was improper or that these checks would have given the Kentucky State Bank any greater insight into Holmes' activities than Doss should have had himself. A party cannot be permitted to claim that he has been taken advantage of if he had the means of acquiring the needed information or if, because of his business experience or his prior dealings with the other party, he should have acquired further information before he acted. *Tokarz v. Frontier Federal Savings and Loan Association,* 33 Wash.App. 456, 656 P.2d 1089, 1094–95 (1983).

Doss concedes that he was aware that Holmes' reputation as a cattle dealer was far from unblemished. He admitted that he

had heard that he [Holmes] had been tried for rustling cattle, you know. That's the biggest thing. At the time,

that's about the only thing. I heard that he had been tried once here in Allen County for rustling cattle.

\* \* \* \* \* \*

I know he beat it. No, I take that back. I heard that he [Holmes] got railroaded in Smith County, too, that they picked on him over there. I forgot about that.

Doss admitted later that he went into business with Holmes because he thought he knew more about Holmes than everyone else did. He also conceded that no representative of the Kentucky State Bank encouraged or influenced him to go into business with Holmes.

Doss also asserts that he was injured because Holmes was purchasing cattle at the market that he already owned. Because Doss, on his own initiative, was permitting Holmes to purchase these cattle on credit, Holmes was able to obtain both the cattle and the payment from the market's custodial account without making his own payment for the cattle either to his original seller or to the livestock market. Doss, conceding that he was not smart enough to discover what Holmes was doing, stated:

I admit that if I—I know if I had known these cattle belonged to Steve Holmes, he wouldn't have had his own cattle—he wouldn't have got a check from the yard and his cattle, too, and left with them. You wouldn't or nobody else. That's what my point is. I didn't know it and I didn't know it by the manner he was entering them in the yard. And he did it for a reason, to keep it from me.

At no time has Doss alleged that the Kentucky State Bank was aware that Holmes was selling his own cattle at the market in the names of others. Nor has Doss alleged that the bank owed him the duty to discover how Holmes was conducting his business and report it to him.

Doss claims finally that he was damaged because of Holmes' practice of depositing checks written on the market's custodial account and made payable to others in his own account. While he claims that the Kentucky State Bank should have informed

same rule. *Scoggan v. Dillon,* 252 S.W.2d 35, 37 (Ky.1952) and *Brashear v. Perry Bank & Trust*

*Company's Liquidating Agent,* 252 Ky. 297, 67 S.W.2d 28, 29 (1934).

him that Holmes had endorsed these checks and deposited them in his own account, he never explained why he did not discover on his own what Holmes was doing soon after it began. Holmes' endorsements on the market's custodial checks would have been readily apparent to anyone who examined the market's cancelled checks when they were returned by the Citizens Bank of Lafayette. These checks plainly bore Holmes' second endorsement indicating that the check had actually been deposited in Holmes' account at the Kentucky State Bank.[10] Doss never offered any explanation why he did not discover Holmes' endorsements on the livestock market's checks that had been made payable to others or why he did not bring this matter to the attention of the Kentucky State Bank or the Citizens Bank of Lafayette.

The uncontradicted, material evidence in this record supports the trial court's decision to grant the Kentucky State Bank's motion for summary judgment. None of the special circumstances which would impose liability upon the Kentucky State Bank for failure to disclose information concerning Holmes' financial conditions are found in this voluminous record. Thus, the trial court's order granting the Kentucky State Bank's motion for summary judgment is affirmed. The case is remanded to the trial court for further appropriate proceedings. The costs of this appeal are taxed against Jimmy Doss and the Macon County Livestock Market, Inc., and their surety, for which execution, if necessary may issue.

LEWIS and CANTRELL, JJ., concur.

---

10. Tenn.Code Ann. § 47–4–406 imposes upon a bank customer a duty to use reasonable care and promptness in examining its bank statements when they are returned.