FIRST AMERICAN NATIONAL BANK,    )
                                 )
        Plaintiff/Appellee,      )
                                 )        Appeal No.
                                 )        01-A-01-9503-CH-00109
V.                               )
                                 )
J.M.D. BRANSFORD,                )        Davidson Chancery
                                 )        No.  91-2790-III
        Defendant/Appellant.     )

FILED

Sept. 13, 1995

Cecil Crowson, Jr.
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE

MIDDLE SECTION AT NASHVILLE


APPEAL FROM THE CHANCERY COURT FOR DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE



THE HONORABLE ROBERT S. BRANDT, CHANCELLOR



B. ANTHONY SAUNDERS
721 First American Center
Nashville, TN  37237-0721

GEORGE H. CATE, III
Neal & Harwell
2000 First Union Tower
150 Fourth Avenue North
Nashville, TN  37219
        ATTORNEYS FOR PLAINTIFF/APPELLEE


ROBERT L. DeLANEY
323 Union Street
Nashville, TN  37201
        ATTORNEYS FOR DEFENDANT/APPELLANT




REVERSED AND REMANDED




                              SAMUEL L. LEWIS, JUDGE

# O P I N I O N

This is an appeal by defendant, J.M.D. Bransford, from the trial court's granting of the motion for summary judgment of plaintiff, First American National Bank (Bank), and resulting judgment in the bank's favor on a promissory note made by defendant Bransford as a co-maker.

This case commenced when the bank, as lender, brought suit against defendant Bransford as a co-maker of a note. The sole issue on appeal is whether the trial court erred in granting summary judgment as to each of the defendant's defenses and entering judgment against defendant Bransford as co-maker on a note.

Mr. Bransford was co-maker with Mr. James W. Stewart on a note for two hundred thousand dollars. Mr. Stewart was the owner and president of TennLite, Inc. and other related businesses. TennLite manufactured permanent briquettes for gas grills and refracting bricks used to line wood-burning stoves. Mr. Stewart's financial condition had continually deteriorated over the course of a long relationship with the bank. Mr. Bransford's defense to the bank's action to collect on the note is that, fully aware of Mr. Stewart's precarious financial situation at the time the loan was made, the bank misrepresented the degree of the risk it entailed to Mr. Bransford.

The loan in question was only the latest of many dealings Mr. Stewart had had with the bank in financing his business ventures. Mr. Stewart began doing business with the bank in 1965. He was regarded by some of the officers of the bank, during the period 1988-89, as being an effective, well-known business person and a "friend of FANB," and as a philanthropist because of his

donations to Vanderbilt University.

In 1987, Mr. Stewart approached the officers at the bank about paying off one of his several existing lines of credit. One of his businesses, TennLite, Inc., had a line of credit of approximately $235,000.00, and Mr. Stewart wanted to increase the line to one million dollars.

Mr. Stewart was starting up a new business, SoniClean, Inc., which was to use a sonic wave process to extract usable material from coal slurry. He needed additional cash to fund the various startup costs associated with Soniclean, Inc.

Becaue Soniclean, Inc. had no credit history and very few assets, it was not the type of business to which the bank was free to extend substantial credit. Mr. Stewart proposed therefore that the line of credit of TennLite, Inc. be extended and the proceeds be used in large part to fund startup costs of Soniclean, Inc.

The bank agreed to this proposal with one minor modification, made in order to "add the needed protection to First American and at the same time preserve the Subchapter 'S' status of Soniclean," according to Wallace Carter, III, the bank official who eventually handled Mr. Stewart's loans. It was agreed TennLite, Inc. was to draw down the line of credit to make loans to Mr. Stewart, the principal shareholder. Mr. Stewart invested most of the one million dollar loan in Soniclean, Inc.

Soniclean, Inc. never became even a marginally successful business. As of 31 December 1988, SoniClean had little funding outide of shareholder investment. In 1989, SoniClean was able to meet some coal contracts, but its ability to generate income from coal sales remained inconsistent, despite Mr. Stewart's sanguine

-3-

assurances to the bank.

Economic distress created by SoniClean, Inc.'s unprofitable circumstances compounded other economic problems Mr. Stewart and his related business entities were having during this period. TennLite, Inc. was losing money. By 1987, sale of the brickets accounted for almost all of TennLite's revenue. The sale of all other products of TennLite were in decline as they had been in both percentage and dollar terms since 1985. By 1988, the cost of manufacturing the briquettes increased while sales diminished. TennLite's income statement during the year ending 30 June 1989 showed a net operating loss of $183,000.00 and a cash loss of $135,000.00.

The income TennLite, Inc. earned during the year ending 30 June 1989 was generated primarily from the sale of real estate it owned and not from the sale of TennLite products. Its economic difficulties were further exacerbated by the necessity of servicing the huge debt it incurred for SoniClean. By March 1989, TennLite had four lines of credit with the bank, the "A term" in the amount of one million dollars, the "B term" in the amount of four hundred thousand dollars, the "C line" in the amount of two hundred thousand dollars, and the "D open-end market" in the amount of twenty-five thousand dollars. Each of these lines of credit were fully funded by the bank.

In March 1989, the bank increased the "C line" from two hundred to four hundred thousand dollars. The bank was willing to extend the "C line" primarily because of a personal guarantee given by Wright Brothers Construction Company covering the entire two hundred thousand dollar "C line" increase.

Soniclean, Inc. also had a letter of credit in the amount

of $62,675.00 through the bank during this same period. This letter of credit was originally approved for New Acton Coal Mining Company, Inc. but was transferred to SoniClean Coal of Alabama, Inc., a subsidiary of SoniClean, Inc., in November 1987.

Mr. Stewart had other business activities funded through loans from the bank which were also troubled. Specifically, Mr. Stewart and TennLite, Inc. owned, through a joint venture known as Stewart & Warren Bohnsack/Russell, Worley & Company, oil and gas rights in the Indian Creek Venture located in Morgan County, Tennessee. Because the other partners in this venture suffered great losses in the 1987 stock market crash, Mr. Stewart had in 1987 assumed payment, by himself, of interest on the approximately nine hundred thousand dollars in debt to the bank associated with this investment.

Mr. Stewart also had personal debt to the plaintiff bank in the amount of at least $300,000.00 as well as a home loan during this same period. He had personally guaranteed each of these debts.

Mr. Stewart had substantial debt to other banks in Nashville personally and in connection with his various businesses during the period 1988-89. He also owed Third National Bank $2,500,000.00 and had a large line of credit at First Tennessee Bank. Plaintiff bank was aware of these loans.

In 1987 Mr. Stewart, personally and in connection with business ventures, had debt financed through Commerce Union Bank/Nations Bank in the total amount of $300,000.00. Mr. Stewart never paid this debt.[1] By 1987 or early 1988, Mr. Stewart and his

---

[1] This debt was ultimately satisfied by the obligation being sold to third parties at full value.

related businesses were in serious economic distress, and the record shows that the plaintiff bank knew or should have known of these facts.

In 1988, the bank changed the officer responsible for managing its relationship with Mr. Stewart and his related businesses. The bank gave Wallace Carter, III the direct responsibility for managing Mr. Stewart's and his related businesses' relationships with the bank.[2] Mr. Carter had moved into the service industries division of the bank, where Mr. Stewart's loans were handled, in September or October of 1987. Mr. Carter commenced closer review of these relationships.

At some point in 1988, the bank reclassified the Stewart and related business loans, changing their credit status from "2" to "4." Under the bank's policies in effect at that time, such a reclassification indicated that, in the bank's assessment, the creditworthiness of Mr. Stewart's loans had diminished.

Credit status 4 was not a "non-performing loan" but was at least one or two levels above non-performing. However, starting in 1988 Mr. Stewart and his related businesses were paying interest only on their obligation to the bank.

In March 1989, the bank moved at least one of TennLite's credit lines to the loan servicing division so it could have closer monitoring. This loan was to be managed as a "Level IV" loan, as all of Mr. Stewart's other business and personal loans ultimately were managed. In March 1989, the bank informed Mr. Stewart that it would no longer provide new funding for SoniClean unless outside equity, rather than the assets of TennLite, Inc., was provided as

---

[2] Mr. Carter had more experience than Julie Brown, the officer who had been managing Mr. Stewart's loans.

collateral.  It was for this reason that the four hundred thousand dollar "C line" which the bank provided TennLite in March 1989 was guaranteed to the extent of two hundred thousand dollars by Wright Brothers Construction Company.

During the 1988-89 period, Mr. Stewart and his related businesses were proposing to Mr. Carter and other officers of the bank the sale of various assets, primarily real estate, to cure Mr. Stewart's financial problems.  The proposed sales never occurred with one exception.  Because of costs associated with grading the property, this lone sale netted substantially less than expected.

Mr. Carter reviewed the financial affairs of Mr. Stewart during part of 1988 through April 1990.  He monitored the progress of the sale of assets.  He reviewed the books and records of Mr. Stewart and his businesses.  He interviewed various individuals doing business with Mr. Stewart and had parcels of real estate and other assets belonging to Mr. Stewart appraised.  Mr. Carter's monitoring included regular visits to Mr. Stewart's offices to review business records and other matters provided by Mr. Stewart and his businesses.  Mr. Stewart continued to provide Mr. Carter with optimistic accounts of his business financial circumstances; however, the financial information belied those representations.

By 30 June 1988, internal records generated by the bank indicated that TennLite, Inc.'s financial status was equivalent to bankruptcy.  However, the bank continued to extend Mr. Stewart and his related businesses credit.

The bank apparently relied on Mr. Stewart's record and reputation and the strength of his personal financial statement, which showed that he had assets of nine million dollars and liabilities of four and a half million during the period 1988-89.

However, liquidation of Mr. Stewart's personal and business assets, pledged as collateral for his debt, has only netted a small fraction of his alleged personal and business net worth.

In late November 1989, Mr. Stewart approached defendant J.M.D. Bransford about co-signing a note for SoniClean, Inc. Mr. Bransford, Mr. Stewart, and others had an office-sharing arrangement in a Nashville office. Mr. Bransford's primary business interest during the period of May-June 1988 through 1990 was a business called August, Inc., a mining operation using chemicals to extract precious metals from spent copper mine tailings.

Officers, directors, and investors in August, Inc., but not Mr. Bransford, hired Mr. Stewart to run August, Inc. for a $10,000.00 monthly fee and a percentage of stock in August, Inc. Mr. Bransford became involved with Mr. Stewart in August, Inc. only after others brought Mr. Stewart into the company.

Despite the physical proximity, Mr. Bransford had no knowledge of any of Mr. Stewart's other businesses, including TennLite, Inc. and SoniClean, Inc. Mr. Bransford testified, "at the time I was not privy to any of the information regarding what James' various interests were. I was not particularly interested in what those businesses were."

When Mr. Stewart approached Mr. Bransford to "sign a note," i.e. a two hundred thousand dollar note as co-maker, Mr. Bransford said, "Jim, I know nothing about the coal business," to which Mr. Stewart responded, "this note will be paid back and the royalties of the production of coal will pay it." Mr. Bransford signed the note as co-maker about one week later.

-8-

Mr. Bransford did not make a due diligence investigation of the status of SoniClean, Inc. before he agreed to co-make the note, but he did talk to Mr. Carter at the bank. Mr. Bransford had come to know Mr. Carter through Mr. Stewart. Mr. Carter had breakfast with Mr. Bransford "to discuss the possibility of his [Mr. Bransford's] moving his trust accounts to the bank."

Mr. Bransford testified by deposition as follows:

Well, I'll tell you why I didn't do it before. There were two reasons; I wanted to help Jim Stewart, one. I knew that Buz [Wallace} Carter was out there two or three times a week in the late afternoon in James' office for significant periods of time. I knew he was staying very close to what was going on and when I relied upon Buz Carter, when I asked the question of Buz, Buz is there anything more risky about signing this note or this investment than a normal business investment, knowing full well that he was involved up to his neck on a weekly daily basis, he replied no.

According to Mr. Carter, Mr. Stewart "handled most of the loan transaction." Mr. Carter further testified, "I think he [Mr. Stewart] was the one who requested it. He was the one who told us that Mr. Bransford was willing to make the transaction, and I don't remember specifically telling Mr. Bransford what the proceeds would be."

Mr. Bransford did not receive any proceeds from the two hundred thousand dollar loan. While there was some discussion of Mr. Bransford's receiving stock in SoniClean, Inc. for co-making the note, this never materialized.

One hundred fifty thousand dollars of the proceeds of the note was distributed the day following the loan as follows: $30,000.00 to SoniClean of Alabama, $20,000.00 to James W. Stewart, and $100,000.00 to TennLite, Inc. Mr. Carter was aware that the proceeds of the two hundred thousand dollar loan would be disbursed

to pay the SoniClean debt.

Defendant insists that the trial court erred in granting summary judgment since there were genuine issues of material fact existing between the parties.

In **Bellamy v. Federal Express Corp.,** 749 S.W.2d 31 (Tenn. 1988), our Supreme Court stated:

> [I]t has been repeatedly stated by this Court that the purpose of a summary judgment proceeding is not the finding of facts, the resolution of disputed factual issues, or the determination of conflicting inferences reasonably to be drawn from facts. The purpose is to resolve controlling issues of law, and that alone.

*Id.* at 33.

In determining whether or not a genuine issue of fact exists in a summary judgment case, we must look at all the evidence, take the strongest legitimate view of it in favor of the party opposing the motion, allow all reasonable inferences from it in its favor and discard all countervailing evidence. If there is then any dispute as to any material determinative evidence or any doubt as to the conclusion to be drawn from the whole evidence, we must deny the motion. **Berry v. Whitworth**, 576 S.W.2d 351, 352-53 (Tenn. 1978); **see also** Tenn. R. Civ. P. 56.03.

No presumption of correctness attaches to decisions granting summary judgment, because they involve only questions of law. Thus, on appeal, we must make a fresh determination concerning whether or not the requirements of Tennessee Rule of Civil Procedure 56 have been met. **Hill v. City of Chattanooga**, 533 S.W.2d 311, 312 (Tenn. App. 1975). In doing so, we must consider the pleadings and the evidentiary materials in the light most

favorable to the movants opponent and must draw all reasonable inferences in the opponent's favor. **Blocker v. Regional Medical Center at Memphis**, 722 S.W.2d 660 (Tenn. 1987).

We therefore review this record to determine whether a genuine issue of material fact exists regarding a valid affirmative defense asserted by the defendant as to his liability for sums due under the note which he co-made. Rule 56 contains two requirements that must be met before granting summary judgment. First, there must be no genuine issue with regard to material facts relevant to the claim or defense embodied in the motion. **Byrd v. Hall**, 847 S.W.2d 208, 211 (Tenn. 1993). Second, the moving party must be entitled to a judgment as a matter of law based on the undisputed facts. **Anderson v. Standard Register Co.**, 857 S.W.2d 555, 559 (Tenn. 1993).

In this instance, the burden is upon the bank to persuade the court that no genuine and material factual issue exists. **Byrd,** 847 S.W.2d at 211. The court must view the evidence before it in favor of the non-moving party, in this instance, Mr. Bransford, and allow all reasonable inferences in his favor and discard all countervailing evidence. **Id.** at 210.

In determining whether a genuine issue of material fact exists, the court is not allowed to weigh the evidence. If it appears from the record that issues of witness credibility and testimonial conflicts concerning material factual matters exist which affect the determination of defenses asserted by the defendant, then the trial court must be reversed. **Id.** at 211. Issues of credibility must be resolved by the trier of fact and cannot be determined by summary judgment. **Id.** at 212.

Defendant insists that a genuine issue exists in the instant case regarding an affirmative defense that the bank concealed or failed to disclose the financial circumstances of SoniClean prior to defendant's execution of the two hundred thousand dollar note as co-maker.

Defendant, by deposition, testified about asking Mr. Wallace Carter, the bank's representative, concerning the advisability of signing the SoniClean note as a co-maker.

The record shows, and Mr. Carter admits, that he was aware of SoniClean, Inc.'s financial circumstances and those of Mr. Stewart and TennLite, Inc., all of which were closely related. Mr. Carter denies, however, that he characterized the two hundred thousand dollar loan "as being of average risk to the bank, because that was never my view of the loan ...."

This fact is disputed. The question remains whether this disputed fact is material and directly related to Mr. Bransford's affirmative defense, both as a practical and legal matter. Defendant Bransford takes the position that he would not have co-signed the note had he known the true facts of SoniClean, Inc.'s financial circumstances.

The record is clear that defendant Bransford received nothing of value for co-making the note, no stock in the company or proceeds of the loan.

Mr. Bransford testified that he relied upon the representation of Mr. Carter, the bank's representative, and was induced to act as a co-maker on the two hundred thousand dollar note relying upon only those representations.

The evidence is that Mr. Bransford had not made a decision to become a co-maker on the note until he had his conversation with Mr. Carter, and that he only signed the note following the conversation with Mr. Carter.

A fair inference can be drawn from the record that Mr. Bransford did not trust Mr. Stewart to report the financial circumstances of SoniClean, Inc. accurately, and that he was aware that Mr. Carter had closely reviewed the financial circumstances of Soniclean, Inc. for the bank.

We therefore think that under this record it was reasonable for defendant Bransford to expect an honest and candid response from Mr. Carter when he posed the question of Soniclean, Inc.'s financial circumstances. The bank had a duty to tell the truth and not to mislead or not to answer at all.

The bank disputes most of the facts; however, for the purpose of reviewing the trial court's decision in granting summary judgment, this court must take the strongest legitimate view of defendant Bransford's evidence, allow all reasonable inferences in his favor, and discard all countervailing evidence. *Byrd*, 847 S.W.2d at 211.

In *Macon County Livestock Market, Inc. v. Kentucky State Bank, Inc.*, 724 S.W.2d 343 (Tenn. App. 1986), this court stated:

> [The bank] has no special duty to counsel the customer and inform him of every material fact relating to the transaction - including the bank's motive, if material, for participating in the transaction - *unless* special circumstances exist, such as where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying upon the bank so to counsel and inform him.

*Id.* at 350 (emphasis added).

The court further held that concealment or failure to disclose becomes fraudulent when "it is the duty of a party having knowledge of the facts to disclose them to the other party." There are three such circumstances under which a lender has such a duty.

> 1. Where there is a previous definite fiduciary relation between the parties.
> 2. Where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other.
> 3. Where the contract or transaction is intrinsically fiduciary and calls for perfect good faith. The contract of insurance is an example of this last class.

*Macon County Livestock Market,* 724 S.W.2d at 349.

Here, the bank and defendant Bransford were parties to the loan agreement. Based on the testimony of Mr. Bransford, it is clear that he reposed his trust and confidence in the bank.

Defendant Bransford further contends that the transaction involving him and the bank was "intrinsically fiduciary," calling for "perfect good faith." He insists that the bank knew that it was woefully under-collateralized and that Soniclean, Inc. was or probably was insolvent. The bank, therefore, was looking for additional collateral and had an obligation to be perfectly candid with Mr. Bransford in statements it made inducing him to provide the additional collateral.

We are of the opinion the bank had a duty to disclose and that it therefore follows that disputed facts about whether Mr. Bransford asked and was not told or was erroneously told by the bank are matters which materially and directly relate to this affirmative defense. The existence of a dispute about such factual matters or doubt as to the conclusion to be drawn from these facts leads us to conclude that summary judgment was erroneously granted by the trial court. *See Byrd,* 847 S.W.2d at 211.

-14-

Title 47 of the Tennessee Code deals with Commercial Instruments and Transactions. Section 47-1-203 provides:

> Every contract or duty within chapters 1 through 9 of this title imposes an obligation of good faith in its performance or enforcement. Tenn. Code Ann. § 47-1-203 (1994).
> "Good faith" means honesty and fact in the conduct or transaction concerned. Tenn. Code Ann. § 47-1-201 (1994).

In *Lane v. John Deer Co.,* 767 S.W.2d 138 (Tenn. 1989), our Supreme Court stated that:

> Good faith imposes an honest intention to abstain from taking any unconscientious advantage of another, even through the forms and technicalities of the law.

*Id.* at 140.

We are of the opinion that the record before this court shows that the bank's failure to disclose the true financial circumstances of SoniClean, Inc. to the defendant Bransford is the proximate cause of Mr. Bransford's loss. *See Boling v. Tennessee State Bank*, 890 S.W.2d 32, 36 (Tenn. 1994).

From the record before us, we can infer that the bank's conduct was the substantial factor in inducing defendant Bransford to sign the note as a co-maker and thereby incur the resulting loss.

Because there is a disputed issue of material fact, we are of the opinion the trial court erred in granting summary judgment. It therefore results that the judgment is reversed and the cause is remanded to the trial court for further necessary proceedings. Costs on appeal are taxed to plaintiff, First American National Bank.

_____
SAMUEL L. LEWIS, JUDGE

-15-

CONCUR:


_____
HENRY F. TODD, PRESIDING JUDGE,M.S.


CONCURS IN SEPARATE OPINION:

WILLIAM C. KOCH, JR., JUDGE