# IN THE COURT OF APPEALS OF TENNESSEE

## AT NASHVILLE

**FILED**

April 23, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| ADMINISTRATIVE BOARD FOR | ) | GRUNDY CIRCUIT |
| FIRST UNITED METHODIST | ) | |
| CHURCH OF TRACY CITY, | ) | NO. 01A01-9804-CV-00193 |
| TENNESSEE, | ) | |
| | ) | |
| Plaintiff/Appellee | ) | HON. CURTIS SMITH |
| | ) | JUDGE |
| v. | ) | |
| | ) | |
| TENNESSEE DEPARTMENT OF | ) | |
| HUMAN SERVICES, | ) | |
| FAGAN THOMPSON, individually | ) | |
| and as Program Manager for DHS, | ) | |
| SOUTHEAST TENNESSEE | ) | |
| PRIVATE INDUSTRY COUNCIL, | ) | |
| INC., and | ) | |
| WANZA LEE, individually and as | ) | |
| Director of SETPIC, INC., | ) | |
| | ) | REVERSED and |
| Defendants/Appellants | ) | DISMISSED |

Michael A. McMahan, Chattanooga, for Appellant Southeast Tennessee Private Industry Council, Inc.

Gregory M. O'Neal, Winchester, for Appellee.

## O P I N I O N

INMAN, Senior Judge

This regrettable controversy arose from an essential misunderstanding between good people dealing in good faith to provide good services to economically disadvantaged families in Grundy and surrounding counties.

The complaint was filed by the First United Methodist Church of Tracy City against the Tennessee Department of Human Services, its Program Manager Fagan Thompson, the Southeast Tennessee Private Industry Council, Inc. [Council], and

its Executive Director, Wanza Lee, to recover the losses it sustained in attempting to provide transportation for participants in a social program.

The legal predicate of the complaint is asserted *fraudulent* misrepresentations and *fraudulent* inducements by the defendants arising from a nebulous agreement by the Church to furnish transportation for recipients of benefits provided by the Families First Program. The Church leased four buses for a period of 90 days for the purpose of transporting the recipients, estimated to be circa 250, on a daily basis, believing that the Council would reimburse it $7.00 per rider, but unaware that DHS would reimburse some of the recipients directly if they provided their own transportation. Most of the participants opted for the money, as a result of which the plaintiff's buses were, as a practical matter, seldom utilized. The Church lost $18,000.00 plus interest on this humanitarian venture.[1]

The trial court found that

"Mr. Lee, as executive director of SETPIC, represented to UMCTC that the only means of providing transportation to Families First participants was by bus. The proof establishes that, had UMCTC known participants in the Families First Program were offered direct payment for transportation and that most would likely elect to be paid directly, the church would not have pursued providing transportation and would not have obligated itself for the cost of leasing buses. This misrepresentation was material as it was a major consideration of UMCTC in estimating the need for buses to provide transportation."

"Mr. Lee was a principle source of information to UMCTC because he had long experience in a field where UMCTC was ignorant. Because of Mr. Lee's superior knowledge, UMCTC reasonably relied on him as a source of information. Their reliance on the information he provided resulted in UMCTC incurring the expense and interest to the date of trial on the loan made by the church to pay the lease."

The judgment incorporates the foregoing finding, and further provides that

". . . false representations were made with (sic) knowingly or recklessly, the Plaintiff actually relied upon the misrepresentations,

---

[1]DHS and Thompson were dismissed on motion, and a claim is presently pending against DHS before the Board of Claims.

and the reliance was reasonable under the circumstances, and the Plaintiff suffered damages as a result of its reliance upon the material representations put forth by the Defendant."

The Council and Mr. Lee appeal, and present for review the issue of whether the plaintiff was entitled to recover under the doctrine of fraudulent misrepresentation because it did not reveal that DHS would pay some participants directly upon their request.

Our review of the findings of fact made by the trial Court is *de novo* upon the record of the trial Court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. TENN. R. APP. P., RULE 13(d); *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26 (Tenn. 1996).

The facts are not in substantial, material dispute. The Reverend Mr. Walters, pastor, testified that his Church was interested in starting a day care center under the Families First Program, to be funded by DHS, which thereupon inquired of the Church if it might also consider providing the transportation necessary for the Program. A meeting was held in Dunlap on July 18 to discuss child care and transportation. The role of the Council was that of transportation broker for DHS.

Mr. Walters attended the meeting in Dunlap accompanied by Martha Nixon, a member of the Church. They were informed that Fagan Thompson, of the Department of Human Services, was in charge of the transportation program for Tennessee, and that the Council would be the broker for DHS in providing the necessary transportation. The Church officials were told that they would be paid about $3.50 per child and $4.00 per adult, later increased to $7.00 per day.

After the Dunlap meeting, Church representatives pursued the matter with the local DHS office in Tracy City. Ms. Nixon began gathering information about the number of people who were eligible and who had indicated in DHS surveys a need for transportation services. She was in contact with the local DHS office

daily for three weeks obtaining census figures about DHS clients who might use transportation. She was not told by DHS about its authority to pay $5.00 per day to participants for alternative transportation.

The Church appointed a committee, made plans, and developed a budget, which concluded that the expenses for the transportation might exceed the revenue, but recommended to the Administrative Board of the Church that it proceed with the project if its expenses were guaranteed for 90 days.

Mr. Walters informed Mr. Thompson that the Church could not provide transportation without a guarantee of its costs. Walters was informed by Mr. Lee that he did not have the authority to guarantee the costs because the approval of DHS was required.

By the end of July, the Church committee had obtained information from the Department of Human Services about the number of people who might be utilizing the transportation program. These figures were furnished to Mr. Thompson and to Mr. Lee.

Mr. Walters testified that Mr. Thompson led him to believe that it would be a "pilot type program" for providing transportation under the Families First Program, and that he discussed the matter with Mr. Lee, who told him that the Council did not then have a contract with DHS. Mr. Andy of the Church admitted that Mr. Lee told them that the approval of DHS was required for any contract.

The Church representatives had been told by DHS representatives that they could expect 45 participants initially and that the number could grow to 250 to 300. These numbers were obtained from interviews by DHS of their clients. Mr. Lee was never a party to the discussions about how many participants would be involved or how many buses would be needed.

The Church finalized its plans to enter into an agreement for transportation of Families First participants on August 14, 1996, and a week later Mr. Walters was informed by Mr. Lee that the rate that the Council was authorized to pay was $7.00 a day. Mr. Walters said this daily rate was inadequate, and acknowledged that at all times he knew that so far as Mr. Lee was concerned the rate would be $7.00 per day per passenger unless he received some authority from DHS.

On August 23rd, there was a meeting at the Department of Human Services offices in Tracy City about the implementation of the Families First Program. The primary purpose of the meeting was to tell the participants what they were supposed to do and explain procedures for all components of Families First including child care, adult education and transportation. At that meeting Mr. Lee announced that the Tracy City United Methodist Church had been selected as the transportation provider. Mr. Walters testified that Mr. Lee stated the Church's expenses would be guaranteed for 90 days, but Mr. Lee denied that he ever discussed a 90 day pilot contract with the Church. Mr. Andy testified that Mr. Lee said a financial guarantee was being "worked on" but no term was mentioned. *Mr. Walters understood that the guarantee would come from DHS,* and acknowledged that Mr. Lee told him at that time that the State had not yet prepared his contract. Mr. Andy admitted "in fairness to Mr. Lee," that he correctly told the Church about a possible guarantee from DHS.

The Church had previously made arrangements with Taylor Bus Sales in Murray, Kentucky, to lease four buses for a period of 90 days. It took delivery of the buses during the last week of August. But before taking delivery of the buses, Mr. Walters called Mr. Lee, who told him that he did not yet have a contract in place with the Department of Human Services. Fagan Thompson of DHS told Mr.

5

Walters that the "contract was in the works," that it would be forthcoming, and "not to worry." Nevertheless, the buses were delivered, even though Mr. Walters knew that no contract had been approved.

A contract was forwarded from the Council to Mr. Andy of the Church on or about August 29th. It *did not provide a financial guarantee.* Whereupon, Mr. Walters called both Fagan Thompson and Wanza Lee, but it was Fagan Thompson of DHS who advised Mr. Walters that an addendum would be forthcoming. Mr. Lee again told Rev. Walters that he could do nothing without directions from DHS and furnished Mr. Walters a copy of his contract with the State *showing that he did not have the authority* to do what Mr. Thompson had apparently promised.

Once the Church began the transportation, there were few participants in Families First who utilized the transportation services, because the Department of Human Services would pay participants up to $5.00 per day to arrange their own transportation. Mr. Lee testified that approval for alternate transportation came from DHS case managers and DHS procedures, that he could not speculate on who would use alternative means, and that he had no knowledge of the research that UMCTC members were doing with DHS about the participants.

The Church stopped its participation in the program and returned the leased buses at the end of the 90 day lease. It then sought redress from DHS for the money that it had lost, but the Commissioner stated that she was unable to resolve the matter.

It is worth emphasizing that Mr. Walters testified that the agreement was made "between myself and Fagan Thompson," and that it was Mr. Thompson who reassured him that the contract was "in the works."

We find scant evidence in this record that Mr. Lee represented or misrepresented anything to the Church, which argues, in the brief, that Lee "candidly admitted" from past experiences that he anticipated a high percentage of the participating people would choose to use the alternative form of transportation.

The record reveals this testimony by Mr. Lee, which we reproduce verbatim:

Q:   Did you know how many people in Grundy County
     would be using that [alternative means]?

A:   No.

Q:   When did you find that out?

A:   Well, as the request for them to start using it would
     come in.  No way to speculate as to the level of activity
     for . . . now, we did feel that a high percentage of the
     people across the group like for stipending, you know.
     That was my feelings.

Q:   From past experience?

A:   Past experience.  But to really know, no way to tell you
     that.

The quoted testimony hardly rises to the admission of anything.

To summarize, there is no evidence in this record that Mr. Lee of the Council fraudulently misrepresented or induced the Church to contract as it did.

To recover for fraudulent misrepresentation, a plaintiff must prove that the defendant knowingly and falsely misrepresented a past or present fact which the plaintiff reasonably relied upon. *Metro Gov't. v. McKinney,* 852 S.W.2d 233 (Tenn. App. 1992).  We reiterate that there is no proof in this record that the defendants knowingly and falsely misrepresented to the plaintiff that some participants might opt to be paid directly by DHS and provide their own

7

transportation. Fraud aside, there is no evidence that the Council deliberately failed to inform the plaintiff that some participants might opt out.[2]

It was the DHS that recruited the Church to submit a proposal to provide the transportation services, and virtually all of the information on which the Church relied was furnished by employees of DHS.

The trial court's decision appears to rest on the following two factual findings: first, that Mr. Lee told the Church that "the only means of providing transportation to Families First participants was by bus" and the second, that Mr. Lee never informed the Church "that participants could elect to be directly paid for transportation." The evidence in the record does not support the trial court's finding that Mr. Lee made this statement. The only testimony on this point was that of Martha Nixon who stated that "[w]e were told that there was no transportation in Grundy County if we did not help." Her use of the passive voice obscures the identity of the person who made that statement. After reading the record as a whole, especially the testimony of the Reverend William Bruce Walters and Leo Andy, we conclude that this statement was most likely made by Fagan Thompson or some other employee of the Department.

In order to recover for fraudulent or negligent misrepresentation, the plaintiff must prove that it reasonably relied on false statements made by the defendant. *See Speaker v. Cates Co.,* 879 S.W.2d 811, 816 (Tenn. 1994); *Metropolitan Gov't. v. McKinney,* 852 S.W.2d 233, 237 (Tenn. App. 1992). The Church's

---

[2]The parties seemingly presumed that the trial court did, in fact, find fraudulent misrepresentation. A careful reading of his findings, however, reveal that he stopped short of finding that Mr. Lee falsely represented that the participants would likely elect direct payments from DHS.

misrepresentation claims against Mr. Lee and STPCI must fail because of their concession that all the representations about the details of the Families First program were made by representatives of the Department. There is no factual or legal basis for holding Mr. Lee or STPIC responsible for these statements.

The trial court's second factual finding is that Mr. Lee did not inform the representatives of the Church that participants in the Families First program could receive a direct stipend for arranging their own transportation. Mr. Lee candidly concedes that he did not inform the Church of this option, but it does not necessarily follow that his failure to do so warrants imposing liability on him or STPIC.

Our courts have recognized that the nondisclosure of information may give rise to an action for fraud. However, concealment or nondisclosure becomes fraudulent only when it is the duty of a party having knowledge of the facts to disclose them to the other party. *See Macon County Livestock Mkt., Inc. v. Kentucky State Bank, Inc.,* 724 S.W.2d 343, 349 (Tenn. App. 1986). This duty arises only when (1) there is a fiduciary relationship between the parties, (2) one of the parties has expressly reposed trust and confidence in the other, or (3) the contract is intrinsically fiduciary and calls for perfect good faith. *See Domestic Sewing Mach. Co. v. Jackson,* 83 Tenn. 418, 424-25 (1885); *Justice v. Anderson County,* 955 S.W.2d 613, 616-17 (Tenn. App. 1997).

These legal standards govern our analysis of the claims in this case even though the claimant is a religious, not-for-profit entity. Religious organizations engaging in secular transactions are not entitled to more favorable treatment by the law simply because their motives are eleemosynary rather than monetary. Under the facts of this case, the Church did not have a fiduciary relationship with Mr. Lee

9

and had not expressly placed its trust and confidence in him. To the contrary, if the Church was placing its trust and confidence in anyone, it was in Mr. Thompson and the other Department employees. The information concerning the opportunity for participants in the Families First program to obtain direct subsidies rather than to use state-provided transportation was publicly available to anyone performing due diligance. Thus, under the facts of this case, Mr. Lee did not have a duty to inform the Church about the other transportation options available to the Families First participants.

We conclude that the evidence preponderates against the judgment which is reversed. The case is dismissed at the costs of the appellee.

_____
William H. Inman, Senior Judge

CONCUR:


_____
William C. Koch, Jr., Judge


_____
Charles D. Susano, Jr., Judge